Finn, J.
Following Schloendorff v. New York Hosp. (211 N. Y. 125), a body of law has developed making the liability of a hospital for injuries suffered by a patient, through the negligence of its employees, depend on whether the injury-producing act was “administrative” or “medical.” The wisdom and workability of this rule exempting hospitals from *659 the normal operation of the doctrine of respondeat superior have in recent years come under increasing attack. Decision in the present case calls upon us to say whether the rule should longer endure.
The plaintiff, Isabel Bing, was severely burned during the course of an operation, performed at St. John’s Episcopal Hospital by her own physician, for correction of a fissure of the anus. She had been made ready for the operation, before the surgeon’s appearance, by the hospital anesthetist and by two nurses also in the employ of the hospital. Preparatory to administering spinal anesthesia, the anesthetist painted the lumbar region of the patient’s back with an alcoholic antiseptic, tincture of zephiran, an inflammable fluid, reddish in color. Again, after induction of the spinal anesthesia, one of the nurses applied the zephiran solution to the operative area. At that time there were three layers of sheeting under the patient.
The nurses were fully aware that the inflammable antiseptic employed was potentially dangerous. They acknowledged that they had been instructed, not only to exercise care to see that none of the fluid dropped on the linen, but to inspect it and remove any that had become stained or contaminated. However, they made no inspection, and the sheets originally placed under the patient remained on the table throughout the operation.
The surgeon was not in the operating room when the antiseptic was applied and at least 15 minutes elapsed before he initiated the preoperative draping process. The draping completed, the doctor took a heated electric cautery and touched it to the fissure to mark it before beginning the actual searing of the tissue. There was a “ smell of very hot singed linen ” and, “ without waiting to see a flame or smoke ”, he doused the area with water. Assured that the fire was out, he proceeded with the operation. Subsequent examination of the patient revealed severe burns on her body, later inspection of the linen, several holes burned through the sheet under her.
In the action thereafter brought against the hospital and the surgeon to recover for the injuries suffered, there was a verdict against both. As to the hospital, with whose liability we are alone concerned, the court charged that that defendant could be held liable only if plaintiff’s injuries occurred through the *660 negligence of one of its employees while performing an “ administrative,” as contrasted with a “ medical,” act. Upon appeal, the Appellate Division by a closely divided vote reversed and dismissed the complaint. The majority of three, reasoning that the application of the antiseptic was in preparation for the operation and, therefore, part of the operation itself, concluded that the injury resulted from a “ medical ” act.
As is apparent, the liability asserted against the hospital is predicated on an independent act or omission of the hospital-employed nurses, and not on any conduct of theirs ordered or directed by a visiting doctor or surgeon or, for that matter, by any physician. The evidence strongly supports the findings, implicit in the jury’s verdict, that some of the inflammable zephiran solution had dropped on the sheet beneath the plaintiff’s body, that it had left a stain discoverable upon inspection, that the nurses in attendance had had full opportunity, before the beginning of the operation, to remove the stained linen and that the solution (which had dropped on the sheet) had given off a gaseous vapor that ignited upon contact with the heated cautery. In the light of these facts, the jury was thoroughly justified in concluding that the failure of the nurses to remove the contaminated vapor-producing linen constituted the plainest sort of negligence.
But, contends the hospital, such negligence occurred during the performance of a “ medical ’ ’ act and, accordingly, under the so-called Schloendorff rule, the doctrine of respondeat superior may not be applied to subject it to liability. The difficulty of differentiating between the “medical” and the “ administrative ” in this context, highlighted as it is by the disagreement of the judges below, is thus brought into sharp focus.
That difficulty has long plagued the courts and, indeed, as consideration of a few illustrative cases reveals, a consistent and clearly defined distinction between the terms has proved to be highly elusive. Placing an improperly capped hot water bottle on a patient’s body is administrative (Iacono v. New York Polyclinic Med. School & Hosp., 296 N. Y. 502), while keeping a hot water bottle too long on a patient’s body is medical (Sutherland v. New York Polyclinic Med. School & Hosp., 298 N. Y. 682). Administering blood, by means of a transfusion, to the wrong patient is administrative (Necolayff *661 v. Genesee Hosp., 296 N. Y. 936), while administering the wrong blood to the right patient is medical (Berg v. New York Soc. for Relief of Ruptured & Crippled, 1 N Y 2d 499, revg. 286 App. Div. 783). Employing an improperly sterilized needle for a hypodermic injection is administrative (Peck v. Towns Hosp., 275 App. Div. 302), while improperly administering a hypodermic injection is medical (Bryant v. Presbyterian Hosp. in City of N. Y., 304 N. Y. 538). Failing to place sideboards on a bed after a nurse decided that they were necessary is administrative (Ranelli v. Society of N. Y. Hosp., 295 N. Y. 850), while failing to decide that sideboards should be used when the need does exist is medical (Grace v. Manhattan Eye, Ear & Throat Hosp., 301 N. Y. 660).
From distinctions such as these there is to be educed neither guiding principle nor clear delineation of policy; they cannot help but cause confusion, cannot help but create doubt and uncertainty. And, while the failure of the nurses in the present case to inspect and remove the contaminated linen might, perhaps, be denominated an administrative default, we do not consider it either wise or necessary again to become embroiled in an overnice disputation as to whether it should be labeled administrative or medical. The distinctions, it has been noted, were the result of “ a judicial policy of compromise between the doctrines of respondeat superior and total immunity for charitable institutions.” (Bobbé, Tort Liability of Hospitals in New York, 37 Corn. L. Q. 419, 438.) The better to understand the problem presented, a brief backward glance into historical beginnings proves profitable.
The doctrine declaring charitable institutions immune from liability was first declared in this country in 1876. (McDonald v. Massachusetts Gen. Hosp., 120 Mass. 432.) Deciding that a charity patient, negligently operated upon by a student doctor, could not hold the hospital responsible, the court reasoned that the public and private donations that supported the charitable hospital constituted a trust fund which could not be diverted. As sole authority for its conclusion, the Massachusetts court relied on an English case (Holliday v. St. Leonard’s, 11 C. B. N. S. 192, 142 Eng. Rep. 769), which in turn was based on a dictum in a case decided in 1839 (Duncan v. Findlater, 6 C1. & Fin. 894, 7 Eng. Rep. 934), failing, apparently, to note that the dictum in the earlier case had been overruled (see Mersey *662 Docks Trustees v. Gibbs, 11 H. L. Cas. 686) and that the decision in the other had been reversed. (See Foreman v. Mayor of Canterbury, 6 Q. B. 211.)[1] At any rate, after the McDonald case was decided (supra, 120 Mass. 132), other courts in this country, though not all on the same theory or for the same reason, followed the lead of Massachusetts in exempting the charitable hospital from liability, and so in time did the courts of New York. (See 1 Scott on Trusts [2d ed., 1956], § 102, p. 2895 et seq.; Bobbé, supra, 37 Corn. L. Q. 119, 120-125.)
Although it was not the first ease to deal with the general subject in this state, Schloendorff v. New York Hosp. (supra, 211 N. Y. 125) was the most important of the early decisions to be handed down by this court. It was there declared broadly that a charitable hospital was not responsible for the negligence of its physicians and nurses in the treatment of patients. Two reasons were assigned for that conclusion. The first was that one who seeks and accepts charity must be deemed to have waived any right to damages for injuries suffered through the negligence of his benefactor’s servants — and yet the rule was not limited to charity patients but was expanded to cover both paying patients and a private or profit-making hospital. (See Bakal v. University Heights Sanitarium, 302 N. Y. 870, affg. 277 App. Div. 572; Steinert v. Brunswick Home, 172 Misc. 787, affd. 259 App. Div. 1018, motion for leave to appeal denied 281 N. Y. 822.) The second reason which the court advanced was that the principle of respondeat superior was not to be applied to doctors and nurses. It was the court’s thought that, even though employed by the hospital, they were to be regarded as independent contractors rather than employees because of the skill they exercised and the lack of control exerted over their work — and yet, we pause again to interpolate, the special skill of other employees (such as airplane pilots, locomotive engineers, chemists, to mention but a few) has never been the basis for denying the application of respondeat superior and, even more to the point, that very principle has been invoked to *663 render a public hospital accountable for the negligence of its doctors, nurses and other skilled personnel. (See Becker v. City of New York, 2 N Y 2d 226; Liubowsky v. State of New York, 285 N. Y. 701, affg. 260 App. Div. 416.)
The Schloendorff rule has pursued an inconstant course, riddled with numerous exceptions and subjected to various qualifications and refinements.[2] While it would serve no useful purpose to trace in detail the doctrinal changes and modifications or the shifting theories advanced to support them, we briefly note two or three of the more striking instances. We have already remarked the qualification which excepts public hospitals, those owned by the state or city, from the operation of the Schloendorff rule and from the application of the medical-administrative distinction. (See, e.g., Becker v. City of New York, supra, 2 N Y 2d 226; Liubowsky v. State of New York, supra, 285 N. Y. 701, affg. 260 App. Div. 416.) And in Berg v. New York Soc. for Relief of Ruptured & Crippled (supra, 1 N Y 2d 499, revg. 286 App. Div. 783), the court carved another large segment out of that rule by holding that those distinctions were to be discarded in every case in which the injury-producing act was performed by a nonprofessional employee.
The cases to which we have adverted do not merely illustrate fluctuation of doctrine and the vicissitudes of judgment. They rather demonstrate the inherent incongruity of the immunity rule itself. A distinction unique in the law should rest on stronger foundations than those advanced. Indeed, the first ground stated in Schloendorff, namely, that there is a waiver by the patient of his right to recover for negligent injury, has long been abandoned as “logically weak” and “pretty much a fiction.” (Phillips v. Buffalo Gen. Hosp., 239 N. Y. 188, 189; Sheehan v. North Country Community Hosp., 273 N. Y. 163, 166.) The second ground — that professional *664 personnel, sncli as doctors, nurses and internes, should be deemed independent contractors, though salaried employees — is inconsistent with what they have been held to be in every other context and, to a large extent, even in this one. For example, the nurse, regarded as an independent contractor when she injures a patient by an act characterized as medical, is considered an employee of the hospital, entitled to compensation, if she should happen to injure herself by that very same act. (See Matter of Bernstein v. Beth Israel Hosp., 236 N. Y. 268.) Further, in holding the city responsible for injuries sustained through the carelessness of members of the staff of a city hospital, not only did we recognize that they were employees, to whom the doctrine of respondeat superior applies, but we noted the anomaly of treating as independent contractors “ persons, who by all other tests are clearly employees ”. (Becker v. City of New York, supra, 2 N Y 2d 226, 235; and cf. Mrachek v. Sunshine Biscuit, 308 N. Y. 116.)
Nor may the exemption be justified by the fear, the major impetus originally behind the doctrine, that the imposition of liability will do irreparable harm to the charitable hospital. At the time the rule originated, in the middle of the nineteenth century, not only was there the possibility that a substantial award in a single negligence action might destroy the hospital, but concern was felt that a ruling permitting recovery against the funds of charitable institutions might discourage generosity and ‘‘ constrain * * * [them], as a measure of self-protection, to limit their activities.” (Schloendorff v. New York Hosp., supra, 211 N. Y. 125, 135.) Whatever problems today beset the charitable hospital, and they are not to be minimized, the dangers just noted have become less acute. Quite apart from the availability of insurance to protect against possible claims and lawsuits, we are not informed that undue hardships or calamities have overtaken them in those jurisdictions where immunity is withheld and liability imposed. (See, e.g., President & Directors of Georgetown Coll. v. Hughes, 130 F. 2d 810, 823-824; Cohen v. General Hosp. Soc., 113 Conn. 188, 193; Pierce v. Yakima Val. Mem. Hosp. Assn., 43 Wn. 2d 162, 171-172.) In any event, today’s hospital is quite different from its predecessor of long ago; it receives wide community support, employs a large number of people and necessarily operates its plant in businesslike fashion.
*665 Based on considerations such as those remarked in the preceding pages, and others, the trend of decision throughout the country has more and more been away from nonliability. (See, e.g., President & Directors of Georgetown Coll. v. Hughes, supra, 130 F. 2d 810, 818-822; Pierce v. Yakima Val. Mem. Hosp. Assn., supra, 43 Wn. 2d 162, 175-177; Note, 25 A. L. R. 2d 29.) As one court observed, “American judicial thinking, which formerly gave ‘ overwhelming ’ acceptance to the immunity rule, now gives that doctrine a very modest majority.” (Pierce v. Yakima Val. Mem. Hosp. Assn., supra, 43 Wn. 2d 162, 177.) In point of fact, a survey of recent cases — those decided since the middle 1940’s — demonstrates, not only that the immunity rule has been rejected in every jurisdiction where the court was unfettered by precedent,[3] but that the doctrine has been overruled and abandoned in a number of states where nonliability had long been the rule.[4]
Although we have hitherto refrained from pronouncing “ the ultimate fate ” of the Schloendorff rule (Becker v. City of New York, supra, 2 N Y 2d 226, 235; Berg v. New York Soc. for Relief of Ruptured & Crippled, supra, 1 N Y 2d 499, 503), we have long indicated our dissatisfaction with it, and only last year, in further expanding the hospital’s liability, the court posed this searching and suggestive question (1 N Y 2d 499, 502): “What reason compels us to say that of all employees *666 working in their employers’ businesses (including charitable, educational, religious and governmental enterprises) the only ones for whom the employers can escape liability are the employees of hospitals? ”
The doctrine of respondeat superior is grounded on firm principles of law and justice. Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through carelessness. It is not alone good morals but sound law that individuals and organizations should be just before they are generous, and there is no reason why that should not apply to charitable hospitals. “ Charity suffereth long and is kind, but in the common law it cannot be careless. When it is, it ceases to be kindness and becomes actionable wrongdoing.” (President & Directors of Georgetown Coll. v. Hughes, supra, 130 F. 2d 810, 813.) Insistence upon respondeat superior and damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care.
The conception that the hospital does not undertake to treat the patient, does not undertake to act through its doctors and nurses, but undertakes instead simply to procure them to act upon their own responsibility, no longer reflects the fact. Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment. They regularly employ on a salary basis a large staff of physicians, nurses and internes, as well as administrative and manual workers, and they charge patients for medical care and treatment, collecting for such services, if necessary, by legal action. Certainly, the person who avails himself of “ hospital facilities ” expects that the hospital will attempt to cure him, not that its nurses or other employees will act on their own responsibility.
Hospitals should, in short, shoulder the responsibilities borne by everyone else. There is no reason to continue their exemption from the universal rule of respondeat superior. The test should be, for these institutions, whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its *667 employees and, if lie was, was lie acting within the scope of his employment.
The rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing. It should be discarded. To the suggestion that stare decisis compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended, not to effect a “petrifying rigidity,” but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it. On the contrary, as this court, speaking through Judge Desmond in Woods v. Lancet (303 N. Y. 349, 355), declared, we would be abdicating “ our own function, in a field peculiarly nonstatutory,” were we to insist on legislation and “ refuse to reconsider an old and unsatisfactory court-made rule.”
In sum, then, the doctrine according the hospital an immunity for the negligence of its employees is such a rule, and we abandon it. The hospital’s liability must be governed by the same principles of law as apply to all other employers.
The judgment of the Appellate Division should be reversed and a new trial granted, with costs to abide the event.

. This historical item prompted one court, which recently abandoned the immunity doctrine, to say: “ Ordinarily, when a court decides to modify or abandon a court-made rule of long standing, it starts out by saying that ‘the reason for the rule no longer exists.’ In this case, it is correct to say that the ‘reason’ originally given for the rule of immunity never did exist.” (Pierce v. Yakima Val. Mem. Hosp. Assn., 43 Wn. 2d 162, 167.)

. See, e.g., Matter of Bernstein v. Beth Israel Hosp. (236 N. Y. 268); Phillips v. Buffalo Gen. Hosp. (239 N. Y. 188); Sheehan v. North Country Community Hosp. (273 N. Y. 163); Dillon v. Rockaway Beach Hosp. (284 N. Y. 176); Liubowsky v. State of New York (supra, 285 N. Y. 701, affg. 260 App. Div. 416); Bakal v. University Heights Sanitarium (supra, 302 N. Y. 870, affg. 277 App. Div. 572); Mrachek v. Sunshine Biscuit (308 N. Y. 116); Berg v. New York Soc. for Relief of Ruptured & Crippled (supra, 1 N Y 2d 499); Becker v. City of New York (supra, 2 N Y 2d 226); Steinert v. Brunswick Home (supra, 172 Misc. 787, affd. 259 App. Div. 1018, motion for leave to appeal denied 284 N. Y. 822).

. See President & Directors of Georgetown Coll. v. Hughes (supra, 130 F. 2d 810); Moats v. Sisters of Charity of Providence (13 Alaska 546); Durney v. St. Francis Hosp. (46 Del. 350); Rickbeil v. Grafton Deaconess Hosp. (74 N. D. 525); Foster v. Roman Catholic Diocese (116 Vt. 124).

. See Ray v. Tucson Med. Center (72 Ariz. 22); Silva v. Providence Hosp. of Oakland (14 Cal. 2d 762); Wheat v. Idaho Falls Latter Day Saints Hosp. (297 P. 2d 1041 [Idaho]); Haynes v. Presbyterian Hosp. Assn. (241 Iowa 1269); Noel v. Menninger Foundation (175 Kan. 751); Mississippi Baptist Hosp. v. Holmes (214 Miss. 906); Avellone v. St. John’s Hosp. (165 Ohio St. 467, 469); Pierce v. Yakima Val. Mem. Hosp. Assn. (supra, 43 Wn. 2d 162).
And, it is worthy of note, there is general agreement among text writers and other commentators that the rule of immunity should be abandoned and the doctrine of respondeat superior reaffirmed to render the hospital liable for the torts of its employees. (See, e.g., 4 Scott, op. cit., § 402, p. 2893 et seq.) 2A Bogert on Trusts and Trustees [1953], § 401, pp. 241-254; Prosser on Torts [2d ed., 1955], § 109, p. 786 et seq.) 2 Harper and James on The Law of Torts [1956], p. 1937, n. 9; Bobbé, supra, 37 Corn. L. Q. 419; Feezer, The Tort Liability of Charities, 77 U. of Pa, L. Rev, 191; Note, 163 Journal Amer. Med. Assn. 283, 285.)