Herbert A. Posner, J.
In the Book of Leviticus (ch 19:15) it is written, "Ye shall do no unrighteousness in judgment: Thou shalt not respect the person of the poor, nor favour the person of the mighty: but in righteousness shalt thou judge thy neighbour.”
If ever there was a classic case to test the mettle of a Judge’s ability to live up to this time-honored precept, this is the case. We were faced with the vexing problem of balancing the common law with common justice.
This is an action for money damages in the sum of $5,462, allegedly resulting from the breach of a lease for an apartment in a multifamily dwelling. The plaintiff is well known and respected in this city as one of the largest (if not the largest) individual owner of residential apartment houses. The apartment in question is one of five thousand in the privately owned development known as "Lefrak City”. The defendants are a young couple who were represented by the husband (Kenneth), appearing pro se; and responding to the complaint with an ingenuous answer. The answer, handwritten by Kenneth Lambert, stated: "My wife and I, left the apartment due to the new birth of my son and the loss of my wife’s income. At the time we were two months behind in rent and had received a 30 day eviction notice. I wrote a letter to the mandalay leasing company explaining our problem. Our two month security covered the two months we lived there without paying. I will pay any fair amount decided upon ” (emphasis supplied). Besides not being represented by counsel, the defendant sat mute during the entire trial and offered no *199 evidence whatsoever in his own behalf. Since the trial, the court has received a memorandum of law from the plaintiff. The memo bears out the fact that the common law for centuries is that a landlord is under no obligation to mitigate damages stemming from the tenant’s breach of the lease agreement. The defendant has not submitted any memorandum of law.
Since the defendant offered no defense to the issue of liability, the sole issue at the trial was the question of "damages.” While the plaintiff’s attorney claimed before the trial began that his client had no obligation to mitigate damages, he nevertheless presented one witness and several documents in an attempt to prove that an effort was made to rerent the apartment. The witness was an assistant manager in Lefrak City, who, while not directly involved in the rental office, exercised certain administrative duties in connection with the rental of apartments. He introduced into evidence the lease (a printed standard form) which showed a rental term of three years from September 15, 1973 to September 30, 1976 with rent payable in "equal monthly installments” of $258 per month. The witness testified that defendants moved out of the apartment on November 20, 1974 owing rent for October and November. The landlord had at that time a security deposit of $502. The apartment was vacant for 17 months and not rerented until May 1, 1976. During this period the defendants paid $45 in September, 1975. The plaintiff claimed (in his complaint) unpaid rent of $4,552 and $910 for legal fees, pursuant to a clause in the lease providing for 20% liquidated damages — resulting in a total claim of $5,462. However, the court’s computation of 19 months rent at $258 per month less the security deposit of $502 and the $45 payment made in September, 1975 came to $4,355. There was no testimony of what the difference of $197 consisted of and the attorney’s testimony of the value of his services (in justification of the 20% damage clause) only persuaded the court to the amount of $300 — resulting in a total of $4,655.
As to the efforts made by the landlord to rerent the apartment, the witness testified that the apartment went on an "availability” list November 25, 1974 and remained on that list until rented. He testified that the rental office consisted of five full-time employees who interview prospective tenants and show them apartments. In addition, advertisements are run daily in the major newspapers to attract tenants. Invoices *200 totaling more than $124,000 were introduced into evidence. However, he could produce no witness nor records to show that an effort was made to rent the defendants’ apartment, except for two documents (introduced into evidence) indicating that an application was received for this apartment on August 19, 1975 but rejected as a poor credit risk. The witness, himself, indicated no personal knowledge of the procedure and practices of the rental office, other than the fact that he approved credit for rental applications.
Based upon all the evidence presented by the plaintiff, the court came to the conclusion that he had failed to establish that he acted in good faith to rerent the defendants’ apartment. This presupposes that by operation of law, he had a duty to mitigate his damages. The landlord had no duty to rent this apartment before he rented similar apartments that had become vacant prior to this one. However, he introduced not one shred of evidence as to what his rental policies were at the time. For all the court knows, he may have had a policy to first rent out apartments that became vacant upon expiration of lease, and to leave breach of lease apartments vacant. It is not for the court to speculate, but the burden of the plaintiff to prove he has a prima facie case. This is especially so when the facts are known only to him or employees under his control. The plaintiff’s only witness testified that there were five employees working in the rental office. Not one of these employees was produced as a witness, though they obviously must know what the rental procedures were during the period in question. The law of evidence is well settled that failure to produce a witness under your control leads to an inference that the testimony of the uncalled person(s) would not support the plaintiff’s version of the facts. (Noce v Kaufman, 2 NY2d 347; Schwier v New York Cent & Hudson Riv. R. R. Co., 90 NY 558; Bleecker v Johnston, 69 NY 309.)
The plaintiff’s evidence that he spent over $124,000 in advertising, during this period, and that he had five people working full time in the rental office, only proves that he generated a lot of prospective tenants for Lefrak City, not for this specific apartment. This court is in no position to speculate why it took the plaintiff 17 months to rerent this apartment with all that advertising and all those employees working in the rental office. This court finds, that as a matter of law, 17 months is an unreasonable period of time for a middle-class apartment in a middle-class neighborhood to remain *201 vacant, absent proof by the landlord that a good faith effort was made to rerent.
Disposing of the factual determination was simple compared to the disposition of the legal question. As stated, heretofore, plaintiff’s attorney claimed, before the trial even began, that a landlord is under no obligation to mitigate damages stemming from the tenants’ breach of the lease agreement. As his authority, he cites Rasch (New York Landlord and Tenant, 2d ed, § 875) as follows:
"Therefore, it is well established that the usual obligation in the law of contracts to reduce damages has no application to a contract of leasing, and a landlord is under no obligation or duty to his tenant to relet, or attempt to relet, abandoned premises in order to minimize his damages.
"A lease grants in praesenti a term which the tenant thereof agrees to pay for. It is like the sale of specific personal property. Title has passed, and all that is left is liability for the purchase money.
"The tenant’s absolute liability, therefore, is unaffected by a landlord’s refusal to relet the premises.”
To support this ancient rule of law (dating back to feudal England), he cites a 1964 lower court case (Fermaglich v Warshawiak, 42 Misc 2d 1077), a 1927 Appellate Division, First Department case (Sancourt Realty Corp. v Dowling, 220 App Div 660), and a 1876 Court of Appeals case (Becar v Flues, 64 NY 518). However, let it not be said that a valid rule of law does not survive time and changing circumstances. The paramount question is whether this rule of law deserves to be validated or summarily abandoned. Law is justice and justice must be the foundation of the law. The Hon. Judge Irwin Shapiro in a recent article entitled, "The Law: Yesterday, Today, Tomorrow” (NYU, Oct. 18, 1976, p 1, col 2) wrote: "The law not only helps formulate and strengthen the beneficial institutions of our way of life but also, like those institutions, grows and alters to meet the needs of our society for a system of justice that accords with the changing patterns of morality and custom which our improved technology continually brings about in our life”.
There is no longer good reason — if there ever was — why leases should be governed by rules different from those applying to contracts in general (Parkwood Realty Co. v Marcano, 77 Misc 2d 690; Sherman Taylor Corp. v Cohen, NYLJ, July 10, 1973, p 10, col 8; Grade Town House v Weinstein, NYLJ, *202 March 14, 1973, p 17, col 4; see, also, Howard Stores Corp. v Robison Rayon Co., 36 AD2d 911). The greatest strength of the common law is its ability to adapt to changing conditions. It is a living, growing, changing thing and nowhere is that growth and that change more evident than in the law of landlord and tenant. Courts across the Nation are rejecting the conveyance theory of landlord-tenant law in favor of simple contract law (Gallet, "The Evolution of Landlord-Tenant Law”, NYLJ, Aug. 13, 1976, p 1, col 1). That trend was recently recognized by this court in Cohen v Werner (82 Misc 2d 295). My colleague Judge Charles H. Cohen approached the problem head on saying (p 297): "In recent years, however, traditional rules of law involved in the landlord-tenant relationship have been changing. In general, this has involved the recognition of a lease not as a conveyance of land but as a contract involving mutual obligations in which the principle of interdependency of covenants should be applied * * * 'The assault upon the citadel’ surrounding the traditional concepts of the law of landlord and tenant 'is proceeding these days apace’ * * * in accordance with 'the adaptability of our judicial system and its resilient capacity to respond to new developments’ ”.
If ever there was good reason to treat leases as a conveyance, that reason no longer exists. With the possible exception of cooperative and condominium apartments where our income tax laws require some vestage of ownership, residential landlords and tenants do not consider the renting of an apartment as a conveyance. It is the owner who keeps title, takes depreciation, deducts real estate taxes and interest and maintains all of the indicia of ownership. A tenant does no more than contract for a package of goods and services to be supplied. (Javins v First Nat. Realty Corp. 138 US App DC 369, 428 F2d 1071, cert den 400 US 925.)
The modern concept of a lease, as viewed both by the courts of this State (Goldner v Doknovitch, 88 Misc 2d 88; West, Weir & Bartel v Carter Paint Co., 29 AD2d 526; 25 NY2d 535; Tonetti v Penati, 48 AD2d 25; Barasch v Goldbetter, NYLJ, April 15, 1975, p 17, col 3), and the Legislature (Real Property Law, §§ 226-b, 235-b, 235-c, enacted in 1975 and 1976) is that a lease is a contract and that the contract principle of interdependency of covenants should be applied. Further, recognition has been given, that the landlord and tenant are not in equal bargaining positions. Both the courts and the Legislature have applied these principles in matters dealing with (1) the right *203 to sublet; (2) the warranty of habitability and (3) in striking out unconscionable clauses. The only major area not yet dealt with by the appellate courts and Legislature of this State is this question of "Mitigation of Damages”. A number of other States have responded judicially. American Jurisprudence (Second Series, vol 49, Landlord and Tenant, § 621, p 594) states: "On the other hand, there is direct authority, as well as dicta, which takes the view, respecting the duty of the landlord in this regard, that it is the duty of a landlord on wrongful abandonment of the premises by his tenant, to make reasonable efforts to reduce the damages from the breach by reletting the premises to a new tenant.” (Benson v Iowa Bake-Rite Co., 207 Iowa 410; Marmont v Axe, 135 Kan 368; Weinstein v Griffin, 241 NC 161; Wright v Baumann, 239 Ore 410; Patton v Milwaukee Commercial Bank, 222 Wis, 167.) "According to considerable authority, also, if the landlord reenters in pursuance of a forfeiture or under a provision of the lease permitting him to do so after his tenant has abandoned the premises, he must then use diligence in seeking a new tenant in order to lessen the damages.” (International Trust Co. v Weeks, 203 US 364; Bradbury v Higginson, 162 Cal 602; Kanter v Safran, 68 So 2d 553 [Fla]; Jordan v Nickell 253 SW2d 237 [Ky]; Crow v Kaupp, 50 SW2d 995 [Mo]; Carey v Hejke, 119 NJL 594; Church Co. v Martinez, 204 SW 486 [Tex]; Brown v Hayes, 92 Wash 300.)
If the lease is now viewed as a contract, then all the rules of law regarding contracts should apply, including the requirement that the injured party make a reasonable effort to mitigate damages. It is interesting to note, that, even though the plaintiff’s attorney did not point out the clause in the lease, there is a clause, entitled, "Remedies of Landlord,” which give contractually to the landlord the same rights he is claiming under the common law. The clause is so unconscionable on its face that even without the recently enacted statute (L 1976, ch 828, eff July 26, 1976, and applicable to all leases, regardless of when executed), this court would have ruled it unenforceable. Governor Carey in his memorandum of approval, acknowledged that, "The concept of unconscionability is not new to the law of this state. The Uniform Commercial Code, at the time of its enactment in 1962, codified the doctrine as it related to the law of sales. It has, however, had limited applicability in landlord and tenant disputes until recently. The doctrine is only now beginning to be judicially
*204 applied in such cases. (See, Tai on Luck Corp. v. Cirota, 35 A.D. 2d, 380; SKD Enterprises v. L & M Offset, 65 Misc. 2d 612; Seabrook v. Commuter Housing Co., 72 Misc. 2d 6; and Harwood v. Lincoln Square Apts., 78 Misc. 2d 1097). This bill would codify the doctrine and establish a defense of unconscionability in landlord and tenant proceedings”.
A colleague of mine, in this court, in a decision dated April 27, 1976 (Birchwood Assn. v Stern, 86 Misc 2d 607)[1] disagreed with the opinion expressed in Parkwood Realty Co. v Marcano (77 Misc 2d 690, supra) that a change in the law is warranted. He stated (p 609) that, "Such a change, if a change is warranted, should be made either by our appellate courts or the Legislature”. But how will the appellate courts have an opportunity to change an unjust law if a court of the first instance does not present them with a case that sharpens the issues and provides a clear opportunity for the appellate courts to deal with the merits of the rule of law. Rarely, if ever, will the tenant appeal. He who must breach a lease for lack of funds and defends himself, will hardly be able to take an appeal. As for waiting for the Legislature "to make the change,” are we an independent branch of government or not? Do we have to wait for another branch of government to tell us when we are wrong? Judge-made law should be changed by Judges, not legislators. Though admittedly, they came very close this year when the Assembly (by a vote of 113 to 25) passed a bill that would have made the landlord’s duty to mitigate damages a statutory one. Alas, it did not get out of committee in the Senate, perhaps to give the courts an opportunity to right their own wrong. (Assembly 278-C, 1975-1976). Judge Fuld writing for the majority in Bing v Thunig (2 NY2d 656, 667) in striking down a rule of law that had been in existence for over a hundred years, stated, "The rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing. It should be discarded. To the suggestion that stare decisis compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended not to effect a 'petrifying rigidity,’ but to assure the justice that flows from certainty and stability. If, *205 instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it. On the contrary, as this court, speaking through Judge Desmond in Woods v. Lancet (303 N. Y. 349, 355), declared, we would be abdicating 'our own function, in a field peculiarly nonstatutory,’ were we to insist on legislation and 'refuse to reconsider an old and unsatisfactory court-made rule.’ ”[2]
There is something basically unjust, basically unreasonable and, therefore, basically not legal about a landlord in an urban society with a housing shortage having no obligation to try to rerent an apartment and mitigate damages. There is something unfair about permitting tenants to be in a different category than other persons entering into a contract. To be sure, a tenant should be required to pay every penny of damage actually sustained by a reasonable landlord acting to mitigate damages but to allow what is really a draconian remedy is foreign to our modern concept of justice.
Since the plaintiff has failed to establish that he acted in good faith to mitigate damages, the court finds that he was entitled only to a reasonable period of time in which to rerent. In this case that was three months. Therefore, adding the three months to the two months unpaid at the time tenants vacated and subtracting the $502 security plus $45 payment *206 made in September, 1975, plaintiff is entitled to a judgment in the sum of $743 for unpaid rent and $148 for legal expenses (20% of $743) for a total of $891 with statutory costs.

. It is interesting to note that the Appellate Term, Second Department, affirmed the court in Birchwood because of the court’s finding that the landlord made a diligent effort to rerent. The court took notice of the new trend but stated, "We need not decide whether this rule should be adopted because it is apparent from the papers submitted in the motion for summary judgment that plaintiff diligently attempted to relet the premises.” (88 Misc 2d 937, 938.)

. The great Cabdozo in his treatise "The Nature of the Judicial Process,” in regard to adherence to precedent, stated (pp 150-152): "I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of Wheeler, J., in Dwy v Connecticut Co., 89 Conn. 74, 99, express the tone and temper in which problems should be met: 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly, and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the legislature.’ If judges have wofully misinterpreted the mores of their day, or if the mores of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors.”