■ WILLIAM D. FRIEDMANN, Respondent, v THE NEW YORK HOSPITAL-CORNELL MEDICAL CENTER et al., Defendants, and SILVERCREST EXTENDED CARE FACILITY, Appellant. [884 NYS2d 733]—

Order, Supreme Court, New York County (Alice Schlesinger, J.), entered July 11, 2005, which, to the extent appealed from, denied the motion of defendant Silvercrest Extended Care Facility (Silvercrest) for summary judgment dismissing the complaint as against it, affirmed, without costs.

The right leg of plaintiff's decedent ruptured after it struck a bed rail while aides at Silvercrest were preparing her for dinner and adjusting her bedding. The decedent was bedridden and had fragile skin that was prone to rupture as a result of medications she took for her numerous ailments. The facility also allegedly failed to promptly respond to the decedent's calls for assistance, and unreasonably delayed in calling 911. The death certificate listed blunt impact trauma to the right lower leg with contusional hematoma complicated by soft tissue disruption and hemorrhage as the cause of death.

"An action to recover for personal injuries or wrongful death against a medical practitioner or a medical facility or hospital may be based either on negligence principles or on the more

particularized medical malpractice standard" (see *Coursen v New York Hosp.-Cornell Med. Ctr.*, 114 AD2d 254, 256 [1986]). Simple negligence principles are applicable to those cases where the alleged negligent act may be readily determined by the trier of fact based on common knowledge. However, where the directions given or treatment received by the patient is in issue, consideration of the professional skill and judgment of the practitioner or facility is required and the theory of medical malpractice applies (see *Reardon v Presbyterian Hosp. in City of N.Y.*, 292 AD2d 235, 236-237 [2002]).

The motion court properly concluded that the claims against Silvercrest sound in negligence, rather than malpractice, and that there are triable issues of fact warranting the denial of summary judgment. For example, a trier of fact can evaluate, without the benefit of expert testimony, whether allegedly permitting the decedent's leg to strike the bed rail while she was being prepared for dinner constituted a negligent act; whether the alleged failure to respond to her calls for assistance was negligent under the circumstances; and whether the delay, if any, in calling 911 was negligent (see e.g. *Halas v Parkway Hosp.*, 158 AD2d 516, 517 [1990]; *Papa v Brunswick Gen. Hosp.*, 132 AD2d 601, 603-604 [1987]).

We have considered Silvercrest's remaining arguments and find them unavailing. Concur—Tom, J.P., Saxe, Moskowitz and DeGrasse, JJ.

Catterson, J., dissents in a memorandum as follows: I must respectfully dissent because, in my opinion, basic negligence principles suggest that the plaintiff's claim sounds in medical malpractice not simple negligence, and, in the absence of a physician's affidavit in these circumstances, the complaint should be dismissed. The harm that befell plaintiff's decedent, the rupture of her right leg, and a massive loss of blood resulting in death after her leg was allegedly knocked into a bed rail by an aide, was not foreseeable by the average, reasonably prudent person. In 1928, Chief Judge Cardozo wrote what has become, perhaps, the most-cited phrase in negligence jurisprudence: "[t]he risk reasonably to be perceived defines the duty to be obeyed." (*Palsgraf v Long Is. R.R. Co.*, 248 NY 339, 344 [1928].)

In this case, foreseeability, and thus the duty to exercise reasonable care in order to avoid the harm that, in fact, was sustained required the application of special skills and knowledge of medical science. In my opinion, this clearly removes the action from the realms of simple negligence.

The plaintiff's decedent was a patient in Silvercrest Extended

Care Facility (hereinafter referred to as Silvercrest) for three years prior to her death on January 4, 1998. She was diagnosed initially with emphysema, chronic obstructive pulmonary disease, and depression. She was ventilator and steroid dependent. She was admitted in the hope that she could be weaned from the ventilator and returned to her home. Her skin was very fragile, a common side effect of steroids, and she suffered from open wounds on her hip, shoulder and hand. She was also bedridden and needed assistance with daily tasks too difficult for her to accomplish alone because of her condition.

The plaintiff, decedent's husband and the administrator of her estate, testified at deposition that during a visit with his wife on January 3, 1998, he was asked to leave her room around dinnertime so that aides could assist her with her personal hygiene in preparation for dinner. When he returned, she complained that the aides had been "very rough." She said they had hit her lower right leg and hurt it. The plaintiff further testified that subsequently he left to go to dinner with friends but was called by his wife and returned to find a pool of blood on the floor and the bedding soaked with blood.

A Silvercrest accident report from January 3, 1998 stated that at 6:30 P.M., a nurse was called because the plaintiff's decedent was complaining of pain in the right leg. A hematoma of three centimeters by three centimeters was noted. The plaintiff's decedent reported that the pain started after two aides helped her clean up and get ready for dinner.

The report further stated that a physician's assistant was called and noted that the right leg was swollen. He, in turn, called the patient's primary care physician, and while talking to the physician, the plaintiff's decedent's leg spontaneously ruptured with about 300 cubic centimeters of blood loss. The report indicated that an ambulance arrived in about 15 minutes, and that the patient was alert when she was transferred to the hospital where she died later that night. The death certificate listed the cause of death as blunt impact trauma to the right lower leg with a contusional hematoma complicated by soft tissue disruption and hemorrhage.

The plaintiff commenced this action against New York Hospital-Cornell Medical Center, owner and operator of Silvercrest, in March 1999. The complaint alleged that injuries were sustained by the plaintiff's decedent when her right leg ruptured after it was allegedly injured on a bed rail by staff who were helping her get ready for dinner. The complaint also alleged that the plaintiff's decedent was left unattended for a substantial period of time after her leg ruptured resulting in large loss of blood that led to her death.

On May 20, 2003, the plaintiff filed and served a notice of medical malpractice action on counsel for Silvercrest, which stated that counsel consulted with at least one doctor who was knowledgeable of the relevant issues and had concluded on the basis of that review that there was a reasonable basis for the action. On March 28, 2005, Silvercrest moved for summary judgment. It submitted an affidavit of Dr. Joseph A. Buda, a professor of clinical surgery, emeritus, at Columbia University, College of Physicians and Surgeons, in support of the motion. Upon a review of the medical records, the bill of particulars, and other relevant documents, Dr. Buda opined that the injury sustained when the patient's leg hit the rail was not caused by any deviation from accepted standards of care and no act or omission by the staff at Silvercrest caused her death five hours later.

In opposition to the motion, the plaintiff submitted an affirmation of counsel, which stated that there were triable issues of fact concerning the negligence of Silvercrest with respect to whether it provided adequate care in the circumstances, whether there was a long delay in rendering assistance to the plaintiff's decedent, and whether the initial acts of Silvercrest ultimately led to her death. The plaintiff submitted the affidavit of Dr. Alan Lewis Schechter, who opined that the treatment rendered by staff at the hospital to which the plaintiff's decedent was taken from Silvercrest was the direct and proximate cause of the patient's death. The affidavit did not mention Silvercrest.

In a decision dated June 30, 2005, the court noted that the plaintiff had not provided any evidence that raised a triable issue of fact as to whether Silvercrest committed medical malpractice and that if the allegations against Silvercrest sounded in malpractice, the omission would be fatal and the motion would be granted. However, the court denied the motion for summary judgment, holding that the allegations against Silvercrest "do not really involve diagnosis or treatment or the failure to follow a physician's instructions, all situations where malpractice is the issue and where testimony by a medical expert is necessary." Additionally, the court found that the claims did not sound in medical malpractice because Silvercrest is a "residential extended care facility for those unable to reside on their own rather than an exclusively medical facility."

Instead, the court agreed with the plaintiff that the claims against Silvercrest sound in simple negligence. The court held that the claims against Silvercrest were that plaintiff's decedent was injured at the outset by the careless treatment of aides preparing her for dinner, and that subsequently she was left unattended for a substantial period of time while bleeding

profusely. The court thus concluded that these were claims of simple negligence that a jury could resolve without the aid of expert testimony.

In my opinion, the motion court erred. I believe its observation that the act complained of was not medical malpractice because it did not really involve diagnosis or treatment does not further the analysis. Moreover, its conclusion that this is not a malpractice action because expert testimony is not required is a rationale that was roundly rejected by this Court in an opinion that was subsequently cited by the Court of Appeals as detailed below.

As a threshold matter, I believe the motion court erred in ruling out a malpractice action based on a differentiation between extended-care facilities and "wholly" medical establishments. Public Health Law § 2801 (3) states that a residential health care facility means a nursing home (which is defined in section 2801 [2] as a facility providing nursing care and health-related service) or a facility providing health-related service. Moreover, it is well settled that malpractice actions may "apply to acts or omissions committed by *individuals and entities* other than physicians where those acts or omissions either constitute medical treatment or bear a substantial relationship to the rendition of medical treatment." (*Karasek v LaJoie*, 92 NY2d 171, 174-175 [1998] [emphasis added], citing *Bleiler v Bodnar*, 65 NY2d 65 [1985].) In any event, there is no dispute, here, that Silvercrest was a facility that offered medical diagnosis and treatment. Hence, I do not believe that any bright line may be or should be drawn based on the classification of an extended-care facility as more residential than medical.

More significantly, in *Karasek,* the Court of Appeals acknowledged that while it had defined *who* may be the object of a malpractice action, it had not yet addressed *what* categories of health-related activity constitute medical treatment or bear a substantial relationship to the rendition of such treatment. (92 NY2d at 175.) It did so in *Karasek* only to the limited extent of holding that licensed psychologists did not offer the sort of medical services that would be covered by the malpractice statute of limitations. In essence, the decision highlighted the lack of a bright line rule as had other Court decisions in the past. (*See Scott v Uljanov*, 74 NY2d 673 [1989] [no rigid analytical line separates malpractice and negligence]; *see also Weiner v Lenox Hill Hosp.*, 88 NY2d 784 [1996].) The Court thus ensured that lower courts would continue, in its own words, to "grapple" with the issue of when an act or omission sounds in malpractice, and when it sounds in simple negligence (*Karasek*, 92 NY2d at 174)—in my view, unnecessarily so.

It is well established that "[f]oreseeability of risk is an essential element of a negligence cause of action because a person can only be 'negligent' when the event giving rise to the injury could have been reasonably anticipated—and thus avoided with the exercise of appropriate care." (*Pinero v Rite Aid of N.Y.*, 294 AD2d 251, 252 [2002], *affd* 99 NY2d 541 [2002], citing *Di Ponzio v Riordan*, 89 NY2d 578 [1997]; *see also Havas v Victory Paper Stock Co.*, 49 NY2d 381, 386 [1980], citing *Heaven v Pender*, 11 QBD 503, 509 [1883, Brett, MR].)

Most law school students can recite by rote the premise that negligence is the failure to exercise reasonable care by ignoring the risk of harm to others. A reasonably prudent man will anticipate natural and probable consequences. (*O'Neill v City of Port Jervis*, 253 NY 423, 433 [1930].) "[R]easonable foresight is required but not prophetic vision." (*Cartee v Saks Fifth Ave.*, 277 App Div 606, 609-610 [1st Dept 1951].)

It is beyond cavil that foreseeability is an equally essential element of malpractice. In 1898, the Court of Appeals held that "[t]he law relating to malpractice is simple and well settled . . . [u]pon consenting to treat a patient, it becomes [the physician's] duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed." (*Pike v Honsinger*, 155 NY 201, 209 [1898].)

The import, therefore, is clear: medical malpractice, like negligence, is the failure to exercise reasonable care, and as in negligence, foreseeability is an essential element. However, in malpractice actions, the element of foreseeability is circumscribed by medical skills and knowledge. In other words, reasonable foreseeability that an act or omission carries the risk of harm, or is likely to cause harm, depends on applying the skills and knowledge that a health practitioner is deemed to possess, and is not within the range of apprehension of the ordinary reasonable prudent person. (*See O'Neill v City of Port Jervis*, 253 NY at 433.)

In the decades following the seminal case of *Pike v Honsinger*, the increasingly convoluted analysis employed by various courts has only served to obfuscate the true distinction between negligence and its subset of medical malpractice. Currently, the determination of whether an action sounds in malpractice or simple negligence depends less on whether foreseeability is within the realm of an average reasonable person or whether medical science or knowledge is required for such reasonable foresight. Rather, determinations are made by utilizing the ritually-cited holding of the *Bleiler* Court that, in a malpractice

action, the challenged conduct "constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician." (*Bleiler v Bodnar*, 65 NY2d at 72.)

As set forth below, the rule has not shown itself susceptible to uniform application. Perhaps not surprisingly since the *Bleiler* Court also observed that "[a] hospital in a general sense is always furnishing medical care to patients, but clearly not every act of negligence toward a patient [by a doctor or nurse] would be medical malpractice." (*Bleiler*, 65 NY2d at 73.)

This case in particular underscores the confusion wrought by such holdings. On appeal, the plaintiff asserts that the motion court correctly determined the action sounds in negligence since the act complained of was nothing more than assistance with personal hygiene. Silvercrest, however, argues that the specialized assistance and care that the plaintiff's decedent received at the facility was part of her treatment in light of her medical condition of fragile skin and propensity to bruise and bleed.

The seeds of confusion were sown, and took root, decades ago. In 1957, the Court of Appeals, in a major departure from precedent and in an attempt to clarify the liability of hospitals, abandoned the distinction between administrative and medical mistakes. (*Bing v Thunig*, 2 NY2d 656 [1957].) Judge Fuld, writing for the majority, observed that the distinction had arisen as a result of "a judicial policy of compromise between the doctrines of repondeat superior and total immunity for charitable institutions." (2 NY2d at 661 [internal quotation marks and citation omitted].) In brief, until then, charitable hospitals were not responsible for the negligence of their physicians and nurses in the treatment of patients, only for injuries that occurred through the negligence of an employee while "performing an 'administrative,' as contrasted with a 'medical,' act." (2 NY2d at 659-660.) But as Judge Fuld noted, "illustrative cases" had not provided "a consistent and clearly defined distinction" between administrative and medical acts. (2 NY2d at 660.)

For example, placing an improperly capped hot water bottle on a patient's body was found to be administrative, keeping a hot water bottle too long on a patient's body, medical; a blood transfusion administered to the wrong patient was administrative, administering the wrong blood to the right patient was medical; using an improperly sterilized hypodermic needle was administrative, improperly administering a hypodermic injection was medical; failing to place sideboards on a bed after a nurse decided they were necessary was administrative; failing to decide they should be used when the need clearly existed was deemed medical. (*Id.* at 660-661 [citations omitted].)

The Court ruled that a hospital could be held responsible for the negligent acts of its employees whether administrative or medical. The distinction between administrative and medical acts was not erased completely, however. Instead, it transmogrified into the distinction between simple negligence and medical malpractice. (*See Morwin v Albany Hosp.*, 7 AD2d 582 [3d Dept 1959]; *see also Miller v Albany Med. Ctr. Hosp.*, 95 AD2d 977 [3d Dept 1983].) In the latter case, the Court enunciated that where "the conduct of hospital staff during care and treatment has been held more 'administrative' than medical[, it can be] measured by ordinary negligence standards." (95 AD2d at 978.)

In *Morwin*, the Court held that, to prove negligence, in many instances, it would not be necessary to get into the realm of malpractice. It then categorized those cases formerly labeled "administrative" mistakes as cases of "negligence easily discernible by a jury on common knowledge." (7 AD2d at 585.) Thus, for example, the failure to have sideboards placed on the bed and the blood transfusion mistakenly administered to the wrong patient, which previously had been labeled administrative acts, were now deemed simple negligence.* (7 AD2d at 585.) The *Morwin* Court thus determined: "True, the medical-administrative distinction is gone, but that relates only to the hospital's liability and not to the quality of the act." (7 AD2d at 585.)

The *Morwin* Court held that the difference between medical and administrative acts, now the difference between negligence and malpractice, could be determined by whether a trier of fact could determine liability on common knowledge. "A layman may easily determine whether the placing of a scalding hot water bottle against a patient was a negligent act, but can he adequately determine whether or not a delicate operation ha[s] been performed properly?" (7 AD2d at 585.) It then concluded: "Malpractice is a peculiar kind of negligence. It is difficult of proof. The jury must usually be presented evidence educed from the testimony of conflicting experts." (7 AD2d at 585.)

Other courts embellished this observation in attempting to create a bright line rule from the evidentiary requirements. In *Hale v State of New York* (53 AD2d 1025, 1025 [4th Dept 1976], *lv denied* 40 NY2d 804 [1976]), the Court held that "[t]he theory of simple negligence is restricted to those cases where the alleged negligent act is readily determinable by the trier of the

---

* It is interesting to note that the Court in *Morwin* labeled the act complained of in *Bing* as administrative, and so one of simple negligence, although the intermediate appellate court had found it to be a medical mistake. (1 AD2d 887 [1956].)

facts on common knowledge." In *Twitchell v MacKay*, the Court established that "[m]alpractice of course is negligence but the jury must usually be presented with evidence educed from the testimony of conflicting experts." (78 AD2d 125, 127 [4th Dept 1980].) The Court elucidated: "the test becomes one of whether the case involves a matter of science or art requiring special knowledge or skill not ordinarily possessed by the average person or is one where the common everyday experiences of the trier of the facts is sufficient . . . In the former, expert testimony is ordinarily required to aid the trier of the facts." (78 AD2d at 127 [citation omitted]; *Smith v Pasquarella*, 201 AD2d 782, 783 [3d Dept 1994]; *see also Miller*, 95 AD2d at 978.)

Indeed, the motion court in this case determined that because the issue was one the jury could resolve on basis of common knowledge, the complaint sounds in simple negligence. Of course, determining the issue on the basis of an evidentiary requirement is standing the issue on its head, and creates a series of assumptions which lead to further mischief.

As this Court held in *Payette v Rockefeller Univ.* (220 AD2d 69 [1st Dept 1996]), while expert testimony may be an evidentiary requirement in a malpractice cause of action, it cannot be the determinative factor in distinguishing negligence from malpractice actions. Justice Sullivan's unanimous decision for the Court observed, first, that the Court of Appeals in its seminal decisions on the elements of a malpractice action had not defined it by whether the acts complained of lay within the realm of a jury's comprehension or whether instead they required expert testimony. Then he noted: "Common sense would seem to dictate that the difference between a medical malpractice and negligence action could never be made to turn on whether expert testimony is required to establish liability." (220 AD2d at 73.) He added: "Not all malpractice claims require expert testimony. For instance, such [expert] testimony would hardly be required to show that leaving a scalpel in a patient does not constitute accepted medical practice . . . Furthermore, a plaintiff may rely on the doctrine of res ipsa loquitur to establish medical malpractice." (220 AD2d at 73.)

Conversely, the necessity for expert testimony does not turn an action into a malpractice one. Indeed, the Court of Appeals held that a case where a patient was given AIDS-tainted blood in a transfusion was a case of negligence not medical malpractice even though there was a necessity for expert testimony, and even though there was physician oversight. (*Weiner v Lenox Hill Hosp.*, 88 NY2d 784, 789 [1996], *supra*, citing *Payette*, 220 AD2d at 69.)

The *Weiner* Court reiterated the lack of a bright line rule. It observed, "the distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and 'no rigid analytical line separates the two.'" (*Weiner*, 88 NY2d at 787, quoting *Scott v Uljanov*, 74 NY2d at 674.) Not surprisingly such holdings have created much opportunity for mischief as abundant case law demonstrates. This is particularly true because the one indisputable distinction, as conferred by the Legislature, is that different statutes of limitations apply to the two causes of action. (*See* CPLR 214-a [a two-year-and-six-month statute of limitations applies to malpractice actions; three years to negligence actions].)

It is virtually axiomatic that defendants will assert that a claim sounds in medical malpractice when the statute of limitations mandates dismissal of a malpractice, but not a simple negligence action. It is equally possible to surmise from the plethora of seemingly arbitrary and inconsistent determinations that courts have sometimes used the lack of a bright line rule in order to grant a plaintiff his or her day in court rather than dismiss on the grounds of an untimely pleading, or as in this case, the absence of a doctor's affidavit. (*See e.g. Coursen v New York Hosp.-Cornell Med. Ctr.*, 114 AD2d 254 [1st Dept 1986].) In *Coursen*, where a 63-year-old post-hernia-operation patient was instructed by the doctor to walk around, the claim against the doctor was deemed malpractice (and dismissed); the claim against the nurse who accompanied him on the walk during which he fell was deemed negligence. However, a case where a postoperative patient fell walking to the bathroom was malpractice because the breach of duty sprang from an improper assessment of how much supervision was required particularly with regard to ability to walk postop. (*Fox v White Plains Med. Ctr.*, 125 AD2d 538 [2d Dept 1986].)

In *Stanley v Lebetkin* (123 AD2d 854 [2d Dept 1986]), in which the plaintiff fell off an examining table, the Court found malpractice because the duty arose from the physician-patient relationship and the Court noted that, if the plaintiff had not consulted defendant as a physician, he would not have been on the examining table; but where, after a biopsy, a patient fell off an examining table while alighting with the help of the physician but not the attending nurse, the Court found negligence, holding that the physician failed to exercise ordinary care because his decision required only his common sense and judgment. (*Reardon v Presbyterian Hosp. in City of N.Y.*, 292 AD2d 235 [1st Dept 2002].)

In both *Papa v Brunswick Gen. Hosp.* (132 AD2d 601 [2d

Dept 1987]), involving a geriatric patient with multiple medical problems who fell after climbing out of a bed with side rails, and *Halas v Parkway Hosp.* (158 AD2d 516 [2d Dept 1990]), involving a 79-year-old weak patient with a fever who fell out of a bed without side rails, the claims were found to sound in negligence. The *Papa* Court found that the allegations did not involve diagnosis or treatment and that the gravamen concerned a failure to exercise ordinary and reasonable care to ensure no unnecessary harm befell the patient. The *Halas* Court also found a failure to exercise ordinary and reasonable care where the facts established that the patient's condition was delicate and where the "risk of harm was recognized." (158 AD2d at 517.)

Meanwhile, the Court in *Raus v White Plains Hosp.* (156 AD2d 354 [2d Dept 1989]) found that a patient who fell out of a bed without side rails after being given a sedative had a claim sounding in malpractice because there were allegations of an "improper assessment of her condition [which] bears a substantial relationship to the rendition of her medical treatment." (156 AD2d at 355.) Further, a patient who fell after being placed in a chair after complaining of light-headedness was found to have a claim sounding in malpractice (*Smee v Sisters of Charity Hosp. of Buffalo*, 210 AD2d 966 [4th Dept 1994]), as did a patient who fell walking to the bathroom after staff failed to respond to her calls for help. (*Zellar v Tompkins Community Hosp.*, 124 AD2d 287 [3d Dept 1986].)

Because the rationale for each of these decisions does not appear to be based on any one clear guiding principle, the decisions bear all appearance of being simply arbitrary. However, some of these same cases were the subject of an interesting analysis by the court in *LaMarca v United States* (31 F Supp 2d 110 [ED NY 1998]) in which the court noted that the "fall" cases deemed to be malpractice were those where it was alleged that "the patient's medical condition was improperly assessed by the hospital staff." (*Id.* at 121, citing *Staveley v St. Charles Hosp.*, 173 FRD 49, 52 [ED NY 1997].)

The court concluded that the findings for a malpractice action were proper in those actions because "the determination of whether a patient is a fall risk is an act which is a 'matter of medical science . . . requiring special skills not ordinarily possessed by lay persons.' " (*LaMarca*, 31 F Supp 2d at 121.)

In other words, the court concluded that where the risk can be perceived only with medical knowledge or skills, the action sounds in malpractice. This rationale, in effect, brings the issue squarely back within basic negligence principles. For example,

foreseeing the risk of a fall for a postoperative patient requires some knowledge of the effects of sedative, the type of surgery that was conducted, a knowledge of how long before effects of anesthesia wear off and when a patient is ready to sit up, or walk unaccompanied or be left without side rails. On the other hand, the geriatric patients in *Papa* and *Halas* were recognized risks and no special skills or knowledge were necessary to assess the risk of harm in leaving such obviously frail patients unsupervised.

In the instant case, Silvercrest asserts that the allegations all pertain to the improper assessment of the patient's condition and the degree of supervision required. Silvercrest's failure to realize or assess that her leg would rupture from being bruised on a bed rail involves diagnosis of her condition at the time, and therefore requires the special knowledge and skills of a health practitioner. The plaintiff, on the other hand, argues that "shifting a patient in bed does not require specialized medical knowledge." But the plaintiff then further argues: Silvercrest "[d]ue to *its knowledge of her physical condition, . . .* owed decedent a higher duty of care in its treatment of her. The breach of this duty resulted in foreseeable injury and ultimately, her demise." (Emphasis added.)

In my opinion, that correct assertion supports a finding that the claim sounds in medical malpractice, not simple negligence. [*See* 9 Misc 3d 1111(A), 2005 NY Slip Op 51489(U).]

