DANIEL R. BURTON, Respondent, v BROOKLYN DOCTORS HOSPITAL et al., Defendants, and NEW YORK HOSPITAL et al., Appellants.

First Department, July 22, 1982

APPEARANCES OF COUNSEL

*Richard J. Concannon* of counsel (*Kathleen M. Burke* and *Geraldine M. Boylan* with him on the brief; *Kelley Drye & Warren,* attorneys), for appellants.

*Emilio Nunez* of counsel (*Mark B. Wiesen* with him on the brief; *Mark B. Wiesen, P. C.,* attorney), for respondent.

OPINION OF THE COURT

SULLIVAN, J.

Plaintiff, blind since infancy from a disease known as retrolental fibroplasis (RLF), caused by his exposure to a

prolonged liberal application of oxygen, has recovered a substantial judgment for medical malpractice against New York Hospital, where he was treated as a premature infant, and two of its physicians, all of whom appeal.

Born five to six weeks premature at Brooklyn Doctors Hospital on July 3, 1953, plaintiff, who weighed only 1,362 grams or three pounds at birth, was transferred the next day to New York Hospital, which had been designated by the City of New York as a premature nursery care center. Transfer was automatic in cases where an infant weighed less than 1,500 grams. At the time, more than half of all premature babies of plaintiff's size died in infancy; many of the survivors either sustained brain damage or were blinded by RLF, a disease which, first identified in 1942, reached epidemic proportions in this country in the late 1940's and early 1950's. The increase in the incidence of RLF coincided with the widespread advances in the development of life-saving techniques in treating premature infants, all of which revolved around the liberal use of oxygen.

RLF is a progressive disease consisting of five stages. Initially, the blood vessels to the retina constrict. In the second stage the vessels enlarge, causing hemorrhaging into the retina. Further bleeding into the inside of the eye develops in the third stage, and in the fourth a localized tear in the retina ("retinal detachment") occurs. Finally, the retina detaches and a fibroid mass develops over the crystalline lens of the eye. The disease is irreversible in the fourth and fifth stages.

In the summer of 1953 a significant segment of the medical community continued to believe that the liberal administration of oxygen to prematures was important in preventing death or brain damage. Yet, a respected body of medical opinion believed that oxygen contributed to RLF. Thus, the medical profession was confronted with a terrible dilemma — the antidote to two problems, death and brain damage, appeared to be the cause of another, blindness. One court, commenting on the perplexity of the problem, spoke of the anxiety of those physicians who "tried to steer their tiny patients between the Scylla of blindness and the

Charybdis of brain damage." (*May v Dafoe,* 25 Wn App 575, 576.)

On July 1, 1953, just two days before plaintiff's birth and after years of unco-ordinated and inconclusive independent investigation, a national human research study known as the Cooperative Study of Retrolental Fibroplosia and the Use of Oxygen (Cooperative Study) was undertaken in an attempt to determine the role of oxygen in RLF and the effect of its withdrawal or curtailment. The Cooperative Study, whose conclusions were announced on September 19, 1954 and published in October of 1956, found that prolonged liberal use of oxygen was the critical factor in the development of RLF, and that curtailment of the supply of oxygen to premature infants after 48 hours to clinical need decreased the incidence of RLF without increasing the risk of death or brain damage.

While liberal exposure to oxygen continued to be routine treatment for premature babies at the time of plaintiff's birth, the view that increased oxygen was a necessary life saver had, as already noted, become suspect. New York Hospital, for instance, had, from January, 1952 to June, 1953, conducted its own study of the effects of oxygen on premature infants and concluded "that prolonged oxygen therapy may be related to the production of RLF". The results of that 18-month study were announced by the hospital on June 16, 1953 at a meeting attended by its pediatricians and ophthalmologists. Because the preliminary results of its investigation were considered to be insufficient, however, the hospital decided to become a participant in the Cooperative Study. This was the situation that existed on July 4, 1953 when plaintiff entered New York Hospital.

At the time of his transfer plaintiff's condition was recorded as "good" and, except for his prematurity, no abnormal conditions were noted. From the time of birth until his arrival at New York Hospital around noon, he was being administered four liters of oxygen continuously. Upon his arrival he was placed under the care of Dr. Lawrence Ross, a pediatric resident, who examined him and found his condition "good, his color pink, cry vigorous and clear lungs throughout." He concluded that plaintiff

was "a vigorous premature infant, in good condition with no abnormalities or anomilies (sic)." A loss of 62 grams in his weight was noted, however, and plaintiff was placed on the "serious list". Dr. Ross directed that plaintiff be placed in an incubator with oxygen at three to four liters. At 11:15 that evening Dr. Ross, aware that oxygen had been implicated as a cause of RLF, ordered that oxygen be "reduced * * * as tolerated." Dr. Ross testified that the order to reduce oxygen was "good medical practice and in accordance with [my] judgment". The following day he noted that plaintiff appeared "to be doing well."

The hospital records indicate that, in compliance with Dr. Ross' order, the nurses did reduce the oxygen flow from three to two and one-half liters, and the concentration of oxygen in the incubator from 35% to 30%. Plaintiff's condition throughout remained good, and no problems necessitating an increase in the oxygen flow were reported.

On July 6 at 2:10 P.M., Dr. Mary Engle, a member of the hospital staff and an instructor in pediatrics at New York Hospital's affiliate, the Cornell University Medical College, on instructions from Dr. Levine, the Chairman of the Department of Pediatrics, entered an order in the hospital record, "Oxygen study: In prolonged oxygen at concentration greater than 50%." At the time Dr. Engle was serving as Dr. Levine's assistant for purposes of co-ordinating the hospital's participation in the Cooperative Study. Dr. Engle conceded that she countermanded Dr. Ross' order without examining plaintiff and without ever speaking to his parents. She testified further that she had no responsibility for the care and treatment of premature infants or the supervision of residents.

The Cooperative Study's methodology was to enter and observe prematures of 1,500 grams or less at birth after 48 hours. Its protocol provided that one out of every three such premature infants be placed in an increased oxygen environment, while two out of three be placed in reduced oxygen. This method of distribution was designed to subject the least number of babies to the risk of blindness that statistics would permit. Of the approximately 760 babies who were placed in the study throughout the United States, only 68 were placed in increased oxygen.

As a result of Dr. Engle's order the concentrations of oxygen went from two and one-half to five liters in one day, and, over a span of 28 days in increased dosages up to a high of nine liters, and from an environment of 30% oxygen to a high of 82%. Dr. Engle testified that at the time of plaintiff's birth the medical community was unsure whether premature babies were better or worse off in routine (increased) oxygen, but conceded that the doctors familiar with the earlier New York Hospital study, of which she was a co-author, had concluded that increased oxygen might be unnecessary for premature babies. Nevertheless, she stated, prolonged oxygen was the routine practice. New York Hospital's manual on the "Management of Premature Infants", which set forth the hospital's rules relating to premature care, provided for the liberal administration of oxygen.

On two or three occasions during the 28-day high oxygen state, ophthalmoscopic examinations were performed on plaintiff's eyes. On July 6 the media, that is, the fluid and tissue inside the eyes, were diagnosed as hazy. Plaintiff's expert testified that such a condition was abnormal in any baby, regardless of the weight. On July 22 and 29 the optical media were again diagnosed as hazy. On August 5, after plaintiff had been removed from his high oxygen environment, a fourth examination showed a large hemorrhage in the right eye, dilation and distortion of the blood vessels. The bleeding was entering the media and some scarring of the retina was evident. On August 12 another examination revealed several hemorrhages in the right eye, as well as swelling and the collection of fluid. The left eye manifested similar conditions. On August 19 a final examination before discharge revealed that the swelling had totally enveloped the eyes.

Except for faint light perception in his left eye plaintiff is totally blind. He suffers daily pain and irritation, which has worsened in recent years and which he eases by rubbing and pressing his eyes. Except for a brief stint in his family's business answering phones, and a part-time job as an interviewer with the Blind Guild he has been unable to find employment. Eventually, because his eyes are shrink-

ing, they will have to be enucleated and replaced with plastic ones.

In 1975 plaintiff commenced this action against New York Hospital, Dr. Ross and Dr. Engle,[*] alleging medical malpractice and the failure to obtain informed consent from his parents before placing him in an increased oxygen environment. The jury absolved Dr. Ross from liability for malpractice, but found him liable for failing to obtain informed consent. New York Hospital and Dr. Engle were found liable under both theories.

Plaintiff's proof clearly established that the prolonged liberal administration of oxygen to which he was subjected caused his blindness, and defendants do not challenge this finding. Since 1954 prolonged exposure to oxygen has been uniformly recognized as the leading cause of RLF. Of the several issues raised defendants' principal contention, as it was at trial, is that the treatment which plaintiff received at New York Hospital was in accordance with applicable 1953 community standards. The question presented to the jury was whether defendants followed sound medical practice in 1953 in permitting plaintiff to be exposed to an increased oxygen environment for a prolonged period, even though it was a common practice at the time, when they were aware of the possibility that RLF might result. Ancillary to that question was whether, even if defendants exercised proper medical judgment, they should have informed plaintiff's parents of the risks involved, and obtained their consent.

■ We believe that the evidence supports a finding that Dr. Engle and the hospital failed in their duty to plaintiff in both respects, and, thus, the verdict of liability against them should stand. We further find that Dr. Ross, who did not order the increase in oxygen, and whose own order to reduce oxygen was countermanded, should not have been found liable at all.

Any analysis of defendants' liability must take into account that when plaintiff arrived at New York Hospital he was a healthy baby, without any unusual conditions,

---

[*] Brooklyn Doctors Hospital, no longer in existence, and the estate of another doctor were named, but never served. A fourth doctor was also named and served but the action against him was discontinued.

except that he was premature and had lost some weight, a not atypical postbirth phenomenon. The treating resident, Dr. Ross, initially placed him in a higher than average oxygen environment, as was common practice at the time, but, recognizing the baby's good health, directed that the oxygen be reduced as tolerated. Yet, Dr. Engle, who was not plaintiff's physician, and who admitted that she had neither examined the baby nor had any responsibility for the care of premature infants, changed the oxygen supply and ordered a drastic increase. No adverse change in the baby's medical condition had been noted at the time. He was progressing well, and indicated no need for additional oxygen. Thus, it seems reasonably clear that Dr. Engle's order to increase the oxygen supply was an administrative judgment, based upon a random allocation of babies into one of two groups for monitoring as part of the Cooperative Study. Neither the hospital nor Dr. Engle offered any medical reason for placing plaintiff in routine (increased) oxygen. Both Dr. Engle and the hospital were aware of the dangers of excess oxygen, and, more importantly, knew or are charged with the knowledge that plaintiff was progressing well in a curtailed oxygen environment.

Although the conventional medical wisdom at the time believed that increased oxygen was essential to the survival of premature babies, the hospital and Dr. Engle cannot avail themselves of the shield of acceptable medical practice when a number of studies, including their own, had already indicated that increased oxygen was both unnecessary and dangerous, particularly for an otherwise healthy baby, and especially when the attending physician, who had primary responsibility for the patient's health, had recommended a decrease. "[A] physician should use his best judgment and whatever superior knowledge, skill and intelligence he has". (*Toth v Community Hosp. at Glen Cove,* 22 NY2d 255, 262.) Moreover, "his judgment must be founded upon his intelligence." (*DuBois v Decker,* 130 NY 325, 330; see, also, *Pigno v Bunim,* 43 AD2d 718; *Cunningham v State of New York,* 10 AD2d 751.)

Furthermore, the jury had before it evidence that symptoms of RLF had begun to appear during the 28-day period

of increased oxygen. Yet, the hospital permitted a healthy infant to remain in a precarious position after symptoms of a disease of which it was aware and, indeed, was studying, had been detected. Thus, the jury could find that even if the hospital had been justified in placing plaintiff in increased oxygen, it should have removed him from the high oxygen environment long before it did because of the results of the periodic ophthalmoscopic examinations.

Moreover, that increased oxygen was the only accepted practice at the time of the study is belied to an extent by the hospital's own involvement in the Cooperative Study. Two out of three premature babies were given curtailed oxygen, while only one out of three was placed in increased oxygen. Thus, by testing two out of three babies, the hospital was acting contrary to its own routine. Without in any way challenging the legitimacy of the debate within the medical community as to the effect of the curtailment of oxygen on premature infants, we find it difficult to believe that any reputable institution would permit two out of three of its patients to receive unusual treatment, which might result in death or brain damage, unless it was fairly convinced that the conventional wisdom no longer applied.

Since compelling evidence was introduced that New York Hospital and Dr. Engle, whatever their uncertainty, were aware that plaintiff's life would not have been jeopardized if Dr. Ross' order to reduce oxygen had been followed, and of the risk of blindness inherent in the high oxygen environment which they ordered, the jury's finding of malpractice should not be disturbed. The issue was submitted to the jury under a proper charge. "If a physician fails to employ his expertise or best judgment, and that omission causes injury, he should not automatically be freed from liability because in fact he adhered to acceptable practice." (*Toth v Community Hosp. at Glen Cove,* 22 NY2d, at p 263.)

In the factual context in which it is presented, the issue of informed consent is, to an extent, virtually inseparable from the malpractice question. Both parents testified that they were unaware that their child had been placed in a study concerning the effects of oxygen on RLF or of Dr.

Engle's order directing that their baby receive prolonged, high concentrations of oxygen. Plaintiff's father testified that he was given a consent form from a nurse which he signed without any elaboration or elucidation as to the risks of the treatment plaintiff was to receive. The consent was general in nature and authorized "the doctors of the New York Hospital to give such treatment and medication to my son which in their judgment becomes necessary while he is a patient in the New York Hospital." In the consent plaintiff's father also waived all claim to prior notification of any treatment. As was customary at the time the consent form itself did not recite any of the risks involved or indeed that the individual signing it had ever been apprised of the existence of such risks.

Defendants contend that in 1953 no legal duty to obtain informed consent based upon broad disclosure of the proposed procedure, its risks and other factors existed in New York or, for that matter, in any other State; and that the doctrine of informed consent was not recognized in New York until 1965. Although the law on informed consent in 1953 was not as explicit as it is today, nor the procedures as refined, Dr. Engle testified that it was the hospital's practice, quite apart from any written consent, to have the house officer or resident, in this case Dr. Ross, inform a patient's parents of all the risks involved and the options available before any patient was put into an experimental study. Dr. Ross, however, had no recollection as to whether he told plaintiff's parents of the risks involved. Plaintiff's expert, Dr. Abramson, although not a physician in 1953, stated that the practice for "centuries" had been to inform patients of the type and risks of treatment, and to obtain their consent.

While the law in New York at that time did not require the detailed imparting of information such as has been statutorily mandated since 1975, either with respect to treatment (Public Health Law, § 2805-d, subd 1) or the conduct of research (Public Health Law, § 2442), doctors were never free to expose their patients to unwarranted risks without first obtaining their consent. As the Court of Appeals noted in 1914 in *Schloendorff v Society of New York Hosp.* (211 NY 125, 129), "[e]very human being of

adult years and sound mind has a right to determine what shall be done with his own body". Defendants argue that this case stands only for the proposition that a surgeon may not operate on a patient without his or her consent, and that it did not place an affirmative duty upon a physician to explain all the risks involved in a course of treatment. Yet, even Dr. Engle viewed a doctor's duty to his patients as more than merely an obligation to refrain from treatment to which a patient had not consented.

The 1965 case which defendants claim created the informed consent doctrine in New York, *Di Rosse v Wein* (24 AD2d 510), does not appear to have been viewed by the court which wrote the decision as imposing upon doctors and hospitals a previously unknown duty. Rather, it appears merely to have recognized the responsibilities of a physician, as they already existed. Because a New York court was not squarely confronted with the issue until 1965 does not mean that the duty did not exist before then. Moreover, in *Salgo v Leland Stanford, Jr. Univ. Bd. of Trustees* (154 Cal App 2d 560), a 1957 case in which defendants claim the doctrine was first enunciated by an American court, the language is equally devoid of any precedent-setting quality. In stating (p 578) that "[a] physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment", the court in no way intimated that it was imposing on physicians an obligation which was not already known to exist.

Thus, in the absence of a New York case rejecting the doctrine of informed consent before 1965, or at least limiting a doctor's liability where he has received a general consent from his patient, we find that the practice at the time of plaintiff's treatment, as testified to by Dr. Engle and Dr. Abramson, was sufficient to establish the duty.

Whether the hospital followed its own practice, and informed plaintiff's parents of the risks involved was, of course, a question of fact for the jury. Its finding is supported by the record since Dr. Ross, upon whom the hospital imposed the duty to inform the Burtons, could not recall doing so, while plaintiff's parents testified that neither had

been informed of any study or of any of the risks. Inasmuch as Dr. Ross did not prescribe the increased oxygen, however, and no evidence was offered of any continuing obligation on his part to obtain informed consent once his order was countermanded by a superior, the verdict against him based on failure to obtain informed consent cannot stand.

One other issue raised warrants comment. New York Hospital argues that it cannot be charged with liability for events occurring in July-August, 1953, because of the doctrine of charitable immunity, which, although subsequently abolished in 1957 by *Bing v Thunig* (2 NY2d 656), was then alive and well (see, e.g., *Mrachek v Sunshine Biscuit,* 308 NY 116). This issue was never raised in a pleading or at trial. Without deciding whether we should reach an issue raised for the first time on appeal, as well as considering both the retroactive effect of *Bing* on cases not yet tried and the applicability of the immunity doctrine, that is "whether the injury-producing act was 'administrative' or 'medical'" (see *Bing v Thunig,* 2 NY2d, at p 658), we note that the malpractice in *Bing* occurred on June 3, 1953, which was before plaintiff's birth. Thus, the *Bing* ruling is directly applicable to this case.

We have examined defendants' other contentions and find that they are without merit, except that we agree that the damage award of $2,887,000 is disproportionate to plaintiff's damages, to the extent that it exceeded $1,500,000.

Accordingly, the judgment, Supreme Court, New York County (DONTZIN, J.), entered February 13, 1981, in favor of plaintiff in the sum of $2,887,000, should be reversed, on the law, without costs or disbursements, and the complaint dismissed as to defendant Dr. Lawrence S. Ross, and modified, on the law and on the facts, as to defendants New York Hospital and Dr. Mary Allen English Engle, to the extent of reversing the judgment in favor of plaintiff and ordering a new trial on the issue of damages only, without costs or disbursements, unless plaintiff, within 20 days after service of a copy of the order to be entered herein, with notice of entry, serves and files in the office of the clerk of the trial court, a written stipulation consenting to reduce the verdict in his favor to $1,500,000 and to the

entry of an amended judgment in accordance therewith. If plaintiff so stipulates, the judgment as so amended and reduced, is affirmed as to defendants New York Hospital and Dr. Engle, without costs or disbursements.

KUPFERMAN, J. P., SANDLER, SILVERMAN and ASCH, JJ., concur.

Judgment, Supreme Court, New York County, entered on February 13, 1981, unanimously reversed, on the law, without costs and without disbursements, and the complaint dismissed as to defendant Dr. Lawrence S. Ross, and modified, on the law and on the facts, as to defendants New York Hospital and Dr. Mary Allen English Engle, to the extent of reversing the judgment in favor of plaintiff and ordering a new trial on the issue of damages only, without costs and without disbursements, unless plaintiff, within 20 days after service of a copy of this court's order, with notice of entry, serves and files in the office of the clerk of the trial court, a written stipulation consenting to reduce the verdict in his favor to $1,500,000 and to the entry of an amended judgment in accordance therewith. If plaintiff so stipulates, the judgment as so amended and reduced, is affirmed as to defendants hospital and Dr. Engle, without costs and without disbursements.