Kurt ALTMAN, M.D., Plaintiff–Appellant,

v.

NEW YORK CITY HEALTH AND HOS-
PITALS CORPORATION; Metropolitan
Hospital Center; Billy E. Jones, M.D.,
President, New York City Health and
Hospitals Corporation; and Dennis A.
Gowie, Executive Director, Metropolitan
Hospital Center, Defendants–Appellees.

No. 1402, Docket 95–9053.

United States Court of Appeals,
Second Circuit.

Argued May 28, 1996.

Decided Nov. 21, 1996.

Pearl Zuchlewski, New York City (Good-
man & Zuchlewski, New York City, of coun-
sel), for Plaintiff–Appellant.

Pamela Seider Dolgow, Assistant Corpora-
tion Counsel of the City of New York (Paul
A. Crotty, Corporation Counsel, Leonard
Koerner, John P. Woods, New York City, of
counsel), for Defendants–Appellees.

Before: VAN GRAAFEILAND,
WALKER and LEVAL, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

On September 30, 1992, the Medical Director of Metropolitan Hospital Center entered a clinic at the Hospital and found a drunken doctor treating a patient. The doctor was Kurt Altman, Chief of the Hospital's Department of Internal Medicine. The incident led to the disclosure of a history of bizarrely favored treatment for Altman, an admitted alcoholic, and to his subsequent termination as Chief of the Internal Medicine Department. This is an appeal from the summary judgment of the United States District Court for the Southern District of New York (Martin, J.) dismissing Altman's action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.,* and New York Executive Law § 296 seeking reinstatement, back pay, damages for mental distress, anguish, pain and suffering, punitive and exemplary damages, attorneys' fees, costs, disbursements and interest. For the reasons that follow, we affirm.

New York City Health and Hospitals Corporation ("HHC") is a public benefit corporation which operates sixteen municipal hospitals in the City of New York. It is the primary provider of medical services to the City's poor. Metropolitan Hospital is a member institution of HHC and serves the population of East Harlem, which is not the silk-stocking area of the City. Metropolitan contains approximately 550 beds and is divided into departments, each with its own staff and chief of staff. Internal Medicine is the largest department, comprising up to 160 beds, and as many as 70 patients in the Hospital's intensive care unit.

New York Medical College, one of the largest private medical schools in the United States, provides medical personnel to a number of HHC hospitals, including Metropolitan, pursuant to a contract with HHC. During their tenure, the doctors in question usually hold positions in both the College and the Hospital. However, appointment and removal of the hospital physicians is the sole prerogative of the President of HHC.

Altman, a native of Austria, began drinking as a medical student in Europe at the age of 25. He drank heavily, and this continued when he came to the United States. Altman began his association with Metropolitan in 1958 and became its Chief of Internal Medicine in 1991. Unknown to HHC officials, he was an alcoholic during this entire period. This was evidenced by periodic binges and drinking sprees, which occurred mainly during weekends and vacation periods. On at least three occasions, he required treatment for his alcoholism. One such lapse occurred in the early 1980's. At that time, Altman was observed taking long lunch hours and had alcohol on his breath when he returned to work. He acted in a bizarre manner, and his speech was slurred. When Dr. Karl Adler, Altman's friend and predecessor, was asked whether he discussed the situation with Altman, he replied:

I think I had the normal response that a chief would have to one of his colleagues but also who's responsible—I felt that this activity couldn't continue and that there needed to be—we needed to take some immediate steps to, one, protect the patients, and, two, to make sure that Dr. Altman underwent some type of appropriate counseling therapy to deal with the issues.

With the help of Dr. Maryann Cohen, a psychiatrist at Metropolitan, Adler was able to secure the services of an outside psychiatrist who placed Altman under a program of counseled therapy. Adler and Cohen did "everything possible" to keep knowledge of the situation from other physicians at the Hospital and the Hospital Administrator. Adler kept no records of this episode, stating that he and Cohen "acted mostly as a referral" and "what we saw as our role was getting him out of the hospital environment and into appropriate therapy."

Altman's recovery, such as it was, was short-lived. On February 27, 1986, he was admitted to St. Luke's/Roosevelt Hospital suffering from alcohol and barbiturate dependence. He was hospitalized for seven days and then underwent therapy treatment at Smithers Alcoholism Treatment and Training Center, which was associated with the Hospital, discontinuing treatment after four months so that he could go to Europe. The Hospital record contains the following

note: "Is very concerned regarding his colleagues finding out that he's being detoxed."

The fact of the matter is that Adler knew about it and said not a word to either Dr. J. Emilio Carrillo, then President of HHC, or Dennis Gowie, Metropolitan's Executive Director. Indeed, Adler hid this information from both Carrillo and Gowie when he subsequently recommended that Carrillo appoint Altman Chief of the Department of Internal Medicine. Adler's explanation for this failure leaves much to be desired. He says that he considered the information to be privileged, but he doesn't say why. It is questionable whether the typical relationship of doctor-patient existed as between Altman and Adler. Moreover, assuming the existence of such a relationship, when the patient becomes a danger to himself or others, under New York law the privilege must give way. *MacDonald v. Clinger*, 84 A.D.2d 482, 487, 446 N.Y.S.2d 801 (1982). " 'The protective privilege ends where the public peril begins.' " *Id.* (quoting *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal.3d 425, 442, 131 Cal. Rptr. 14, 551 P.2d 334 (1976)).

Adler's argument that Altman himself was not legally bound to furnish this information is a glaring misstatement of the professional and legal obligations of a doctor seeking an important medical position. Neither Adler nor Altman could have been unaware of the fact that it is professional misconduct to practice medicine while the ability to practice is impaired by alcohol or being habitually drunk. *See, e.g.,* N.Y. Educ. Law § 6509(3) & (4). In any event, Adler was not simply a silent bystander to Altman's misdeeds. He was an active participant in securing for Altman the appointment of Chief of Internal Medicine that otherwise Altman quite obviously would not have received.

The final note at Smithers, which followed four months of group therapy, reads: "Patient did not recontact the service after the trip to Europe. Overconfident about his ability to abstain. Prognosis Guarded."

The irony in all of the foregoing is that when Altman yielded once again to the lure of alcohol, he did so at a reception honoring his appointment as Chief of the Department of Internal Medicine. This was followed by another vacation trip to Europe during which his drinking went completely out of control. It did not improve when he returned. He drank about a pint of vodka and a six pack of beer every day. Altman admits that he drank on the evening before the above-described September 30, 1992 incident, that he had a few more drinks in the morning before going to work, and that he drank three martinis during his luncheon recess. It is not surprising that he was discovered to be so drunk that he had difficulty in picking up his otoscope and returning it to its case. Neither is it surprising that he reentered St. Luke's the following day at the insistence of Dr. Adler and his confidant, Dr. Richard Stone. A note in the hospital record dated October 4, 1992 reads: "[s]till quite distressed at being coerced into a Rehab by his job—wants to blame us."

Following Altman's reassignment to Smithers Detoxification Service, the Dimensions of his problem were analyzed and charted on a scale of severity ranging from 1 to 9. Under the Dimension relating to Treatment Acceptance/Resistance, Altman was rated 9 on a classification which read as follows:

Despite serious adverse consequences and/or effects of addiction on the patient's life, he/she does not accept or relate to the severity of these problems. Therefore the patient is in need of intensive motivating strategies, activities, and processes only available in a 24–hour structure.

On the Dimension entitled "Relapse Potential," Altman was rated 9 on a classification that read: "Patient is unable to control use as long as alcohol/drugs are present."

On the Dimension entitled "Recovery Environment," Altman was rated 9 on a classification that read:

Patient's job is such that his/her continued A/D use constitutes substantial imminent risk to public or personal safety.

Prior to Altman's discharge from his treatment at Smithers, the doctor who interviewed him made the following observations:

He has an intellectual understanding of his disease. He needs time to internalize his

powerlessness & to become willing to make behavior changes.

Kurt has not dealt [with] his feelings. Anger & shame are obstacles which Kurt needs to become willing to address. Control is also an obstacle.

. . . .

Kurt needs continued support & direction to attend AA/NA [meetings]. He does not recognize the need for sober support in AA/NA [with] peers.

The Discharge Summary itself reads in part as follows:

### RESPONSE TO TREATMENT

Kurt has an intellectual understanding of his disease. He remains in denial however, as evidenced by his son's report that he has been drinking over the pass [sic] 2 years which [Kurt] denies. He needs time to become willing to deal with his anger and shame and control issues.

### SIGNIFICANT REMAINING PROBLEMS

1. Alcoholism
2. Underestimates disease
3. Control issues

### PROGNOSIS

GUARDED

Immediately following the September 30, 1992 incident, Altman was placed on medical leave, and another doctor in the Department of Internal Medicine was appointed acting Chief of the Department. Altman was informed that the length of his leave would depend upon his medical condition and his ability to resume his full duties. However, within weeks of his discharge from Smithers on November 3, 1992, Altman indicated his desire to resume his job. This is an appropriate point to stop and summarize in Altman's own sworn testimony the duties and prerogatives that are involved in the job of Chief of Internal Medicine:

3. (a) In June, 1991, I was appointed to the position of Chief of the Department of Internal Medicine ("Chief of Medicine"), a highly visible position at Metropolitan and in the community Metropolitan serves.

(b) The Chief of Medicine is responsible for all aspects of Metropolitan's Department of Medicine, including clinical services, personnel and financial administration and supervision of the residents and other staff. The Chief of Medicine routinely interacts with the Medical Director, other Chiefs of Services, the Executive Director at Metropolitan on both patient care and administrative matters. In addition, the Chief of Medicine appears before HHC's Board of Directors to report on activities at the hospital and promotes Metropolitan through speaking engagements and appearances before groups such as the Community Board.

\* \* \* \* \* \*

Q. Now, as the chief of medicine I understand that you are pretty much on 24-hour call for emergencies; is that correct?

A. Yes.

Q. Was that true as the associate chief?

A. No.

\* \* \* \* \* \*

Q. And then when you would be ward attending you would be supervising maybe 15 or 20?

A. No, the team consisted of attending physician, one senior resident, two senior residents and maybe one or two medical students.

Q. So we'd be talking how many doctors?

A. About three to four.

Q. Three or four doctors?

A. One or two medical students.

Q. And how many patients?

A. 15 to 25.

Q. Now, when you became chief of service, a much larger number of people were reporting to you; is that correct?

A. Correct.

Q. And you were responsible for how many beds in the hospital, so to speak, if I'm phrasing this properly?

A. Well, I'm responsible for all patients as chief of service at all times, not because I was responsible for direct patient care

but overseeing, and if a problem arose, I was involved.

Q. So that would include being called at home or on an emergency situation?

A. Yes.

\* \* \* \* \* \*

A. We are talking about 160 beds, 140 to 160 beds occupancy.

Q. So all of those patients would come into your control, if that's the right word—

A. Yes, I'm ultimately responsible.

Q. —your responsibility?

A. And medical attending staff of roughly 40 full-time attendings, 30 or so part-time or voluntary attending staff and a house staff of 70.

Q. The house staff would be?

A. Interns, residents and fellows.

Q. What about medical students?

A. Yes, the medical students, there were at any one time between 6 to 15, depends on—10 medical students.

Q. So we're talking perhaps 140 MD's?

A. Except the medical students.

Q. Well, 40 full-time attendings, 30 part-time attendings and then staff and fellows of 70?

A. Yeah.

\* \* \* \* \* \*

Q. So would it be correct to say then you were responsible for perhaps a third of the hospital's patients?

A. Correct.

Q. And those would include the patients with the most life-threatening conditions; is that correct?

A. Yes.

\* \* \* \* \* \*

Q. Now, what else were your duties, as you recall them, as the chief of service?

A. As chief of service?

Q. Yes.

A. I was also the director of the residency program, internal medicine residency program.

Q. What did that involve you doing?

A. To oversee and structure the educational aspect of residency training and medicine, conforming to the guidelines set forth by New York Medical College and the accreditation counsel for graduate medical education, which is the sponsoring agency to accredited all residency programs in the country.

\* \* \* \* \* \*

Q. What other functions did you serve in as chief of service?

A. Overseeing the quality assurance, quality improvement plan of the department, implementing all policy set by the hospital and regulatory agencies which was the state and the joint commission accreditation health care facilities—health care organizations, sorry—and overseeing the teaching of attending physicians and house staff as well as medical students as dictated by education policies set within the department under the auspices of New York Medical College. My responsibility of overseeing the budget of the department, participating in various discussions and conferences concerning budgetary allocations to the department of medicine and its distribution including salaries, staffing within the department of medicine which consist—

Q. Staffing?

A. Staffing within the department of medicine, how many attending physicians, how many subspecialists each division, what their staffing and budgetary needs are.

\* \* \* \* \* \*

Q. Is there anything else you can think of?

A. Well, it's also to promote the standing, the community standing and the professional standing of the department among patients and among health professionals, improving your training program, improving your patient care program. Every day we have aspects of that to improve on existing—that's an ongoing—eventually people say by the department of medicine Metropolitan Hospital is a reputable place where one would go for treatment and—

Q. Or vice versa?

A. Yes, or vice versa. Also to oversee the functioning of the outpatient department, the clinics.

When Dr. Billy Jones, Carrillo's successor as President of HHC, and Dennis Gowie learned for the first time of Altman's history of alcoholism, Jones decided that Altman should not be allowed to resume his position as Chief of Internal Medicine, and Gowie agreed. They were confirmed in their decision by subsequently acquired information concerning a number of disreputable incidents in Altman's personal and professional life that need not be recounted here. Jones instructed Adler to inform Altman that if Altman did not resign as Chief of Medicine, he would be discharged from that office.

On January 4, 1993, this ultimatum was conveyed to Altman, and he stated that he would resign. When Altman subsequently changed his mind, he was told that HHC already had accepted his resignation. He was told that he could return to Metropolitan as an attending physician. His salary in that position would be $130,000, which was $40,000 less than his salary as Chief of Internal Medicine, but $10,000 more than other staff physicians were being paid. The district court held that this was a "reasonable accommodation" under the ADA, 903 F.Supp. at 514, and we agree. See Guice–Mills v. Derwinski, 967 F.2d 794, 798 (2d Cir.1992). Altman refused to accept the offer, electing instead to seek equitable relief in the district court. On February 16, 1993, he brought suit against HHC, Metropolitan, Jones and Gowie in the Southern District of New York in which he sought a preliminary injunction restoring him to the position of Chief of Internal Medicine. Chief Judge Griesa denied the petition in an unreported opinion which states in part:

On the present record, it is difficult to find any likelihood of success, or even serious questions on the merits. The problem of plaintiff's alcoholism, and his drunkenness while on duty, presented the hospital with a grave problem. To his credit, plaintiff has striven to rehabilitate himself, and it is hoped that he is successful. However, the hospital is entitled to protect itself against the risk of a return of the problem, and to deal with plaintiff on some sensible trial basis. It would seem that the hospital has indeed extended itself in offering plaintiff the opportunity to return both as a physician and in an executive capacity, although not in the very high position that he had held before the September 1992 incident.

No. 93 Civ. 882, 1993 WL 106166 at *3 (S.D.N.Y. Apr. 2, 1993). Judge Griesa's order was affirmed without opinion by this Court. 999 F.2d 537 (2d Cir.1993).

Altman returned to work as a senior attending physician on June 29, 1993 and is still employed in that capacity. On February 7, 1994, he commenced the instant action.

**Discussion**

Aside and apart from the doctrine of respondeat superior that now is applied to hospitals in New York, see Bing v. Thunig, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957), the New York courts long have recognized a direct duty on the part of hospitals to deny the use of their facilities to incompetent personnel. See Stern v. Yasuna, 15 N.Y.2d 741, 743, 257 N.Y.S.2d 172, 205 N.E.2d 309 (1965)(mem); Zophy v. State of New York, 27 A.D.2d 414, 416, 279 N.Y.S.2d 918 (1967); Robertson v. Charles B. Towns Hosp., 178 A.D. 285, 287, 165 N.Y.S. 17 (1917). New York's Declaration of Policy with respect to hospitals is that "[h]ospital and related services including health-related service of the highest quality, efficiently provided and properly utilized at a reasonable cost, are of vital concern to the public health." N.Y. Pub. Health Law § 2800. New York courts therefore recognize improvement of the quality of medical care as a permissible State objective. See Lilly v. Turecki, 112 A.D.2d 788, 492 N.Y.S.2d 286 (1985). With this objective in mind, review boards are authorized for the express purpose of improving the quality of hospital care. See Zion v. New York Hosp., 183 A.D.2d 386, 389, 590 N.Y.S.2d 188 (1992); Albany Medical Ctr. Hosp. v. Denis, 161 A.D.2d 1030, 557 N.Y.S.2d 523 (1990). For these boards to function as intended, information concerning medical misconduct must be conveyed to them, and assurances of confidentiality are furnished to encourage such transmissions.

*See Shapiro v. Central Gen. Hosp., Inc.,* 171 A.D.2d 786, 787, 567 N.Y.S.2d 507 (1991). The ADA does not require a lowering of such standards. *See* 42 U.S.C. § 12201(b); *Wood v. County of Alameda,* 875 F.Supp. 659, 664 (N.D.Cal.1995).

Among the definitions of medical misconduct set forth in section 6530 of New York's Education Law are practicing the profession with negligence or incompetence on more than one occasion, practicing the profession while impaired by alcohol, and being a habitual user of alcohol. In this respect, the New York statutory requirements do not differ markedly from those of the ADA, which provide that a covered entity may prohibit the use of alcohol at the workplace by all employees; may require that employees shall not be under the influence of alcohol at the workplace; and that the entity may hold an employee who engages in the illegal use of drugs or who is an alcoholic to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee. 42 U.S.C. § 12114(c)(1), (2), (4). Altman, an admitted alcoholic, has been guilty of the above-described improper acts. What's more, he violated the duties of good faith and loyalty that he, an important officer, owed his superiors by concealing his misconduct from them. *See Hadden v. Consolidated Edison Co.,* 45 N.Y.2d 466, 470, 410 N.Y.S.2d 274, 382 N.E.2d 1136 (1978); *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 850 (2d Cir.1987). As the *Hadden* court stated, in some situations there is little distinction between concealment and affirmative misrepresentation. 45 N.Y.2d at 470, 410 N.Y.S.2d 274, 382 N.E.2d 1136. Where, as here, the health and welfare of the public are concerned, concealment of misconduct is as mischievous as affirmative misrepresentation.

The problem that confronted Jones when he was asked to restore Altman to his former position within two months of Altman's discharge from Smithers can be summed up in the following brief colloquy between Altman and defense counsel during Altman's deposition:

Q. Well, in your position as the chief of service, if you were to have a relapse it could have had some serious consequences for the hospital, could it not?

A. Yeah.

. . . .

Q. Would you agree that the hospital had a legitimate concern about making sure you didn't have a relapse when you were in a supervisory position; is that correct?

A. Sure, yes.

Q. Because all kind of damage could be done to patients and hospital; is that correct?

A. Right.

With this correctly described situation in mind, Jones had to be reasonably satisfied that Altman would perform the essential functions of Chief of Internal Medicine before complying with Altman's request. Jones was not satisfied; and, like the district court, we do not see how he could have reached any other conclusion. Although Adler and Stone felt that Altman could return to his position at the hospital, we may assume that they felt the same way when they accepted his return without objection in 1980 and 1986. Events proved that they erred, and, where the lives of patients are concerned, there is little room for such error. The difficulties and impracticalities involved in the vaguely described and somewhat conflicting proposals for monitoring Altman's conduct and sobriety were discussed in the district court's opinion. 903 F.Supp. at 510–13. Most of the difficulties and impracticalities arise out of the largely autonomous position of Chief of Internal Medicine. Time-worn statements such as "the King can do no wrong," and "the Emperor is subject to no one but God" come readily to mind.

■ In granting the defendants' motion for summary judgment, the district court stated that "it [was] impossible to avoid the conclusion that plaintiff was unqualified to serve as Chief of Medicine." *Id.* at 513. We have examined the record de novo and we agree. Under the circumstances, the grant of summary judgment was proper. "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)). This rule has been applied in numerous ADA and Rehabilitation Act cases. *See Fink v. New York City Dep't of Personnel,* 53 F.3d 565, 566 (2d Cir.1995); *Maddox v. University of Tennessee,* 62 F.3d 843 (6th Cir.1995); *Myers v. Hose,* 50 F.3d 278 (4th Cir.1995); *Doe v. University of Maryland Medical Sys. Corp.,* 50 F.3d 1261 (4th Cir.1995); *McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850 (5th Cir.1993), *cert. denied,* 510 U.S. 1131, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994); *Bradley v. University of Texas M.D. Anderson Cancer Ctr.,* 3 F.3d 922 (5th Cir.1993), *cert. denied,* 510 U.S. 1119, 114 S.Ct. 1071, 127 L.Ed.2d 389 (1994); *Fuller v. Frank,* 916 F.2d 558 (9th Cir.1990); *Smith v. Midland Brake, Inc.,* 911 F.Supp. 1351 (D.Kan.1995); *Dyer v. Jefferson County Sch. Dist. R–1,* 905 F.Supp. 864 (D.Colo.1995). It was correctly applied in the instant case.

Because the district court concluded that Altman's disability would prevent him from performing in a reasonable manner the activities involved in the position of Chief of Internal Medicine, it also correctly dismissed Altman's claim under New York's Human Rights Law. *See* N.Y. Exec. Law § 292(21).

The judgment of the district court is affirmed.