Michael GILBERT, Plaintiff–Appellant,

v.

SETON HALL UNIVERSITY, Defendant–Appellee.

Docket No. 02–7524.

United States Court of Appeals, Second Circuit.

Argued: Dec. 11, 2002.

Decided: June 13, 2003.

Richard J. Weiner, Nanuet, N.Y., for Plaintiff–Appellant.

Steven Backfisch, Lindabury, McCormick & Estabrook, Westfield, N.J. (Robert J. Avallone, Lewis, Johs, Avallone, Aviles & Kaufman, Melville, N.Y., on the brief), for Defendant–Appellee.

Before: NEWMAN, SACK, and SOTOMAYOR, Circuit Judges.

Judge SOTOMAYOR dissents with a separate opinion.

JON O. NEWMAN, Circuit Judge.

This appeal concerns choice of law with respect to charitable immunity. The spe-

cific issue is whether New York, the forum state, would apply New Jersey law, which preserves charitable immunity, or the law of New York or Connecticut, both of which have abolished such immunity, to a tort claim brought against a New Jersey university by a Connecticut student attending the university who was injured while participating in an extracurricular sporting event in New York. Michael Gilbert appeals from the December 8, 2000, judgment of the District Court for the Eastern District of New York (Marilyn Dolan Go, Magistrate Judge) granting Seton Hall University ("Seton Hall") summary judgment on his claims seeking damages for injuries sustained during a rugby match in 1992. The District Court held that Seton Hall was immune from liability under New Jersey's law of charitable immunity. We agree with the District Court that the New York Court of Appeals would apply the charitable immunity law of New Jersey to this case, and we therefore affirm.

## Background

### I. Facts

*Seton Hall and Its Rugby Club.* Seton Hall is a nonprofit educational institution located in South Orange, New Jersey. In addition to its intercollegiate athletics program, Seton Hall makes available to its students "club sports," which, according to a Seton Hall manual, are "organized, financed, and run by students with the administrative assistance of the [Department of Recreational Services]." Seton Hall regulates club sports in various ways. For example, Seton Hall prohibits alcohol at any "University sponsored club sport event." Although the regulations do not specifically require club sports to have a coach or a faculty advisor, the manual refers to coaches and faculty advisors and imposes upon them certain requirements.

Rugby at Seton Hall is a club sport. Players participate through the Seton Hall Rugby Club ("Rugby Club"). The Rugby Club's charter states that it is "organized subject to the authority of Seton Hall University ... and in conjunction with the Metropolitan New York Rugby Union" ("MNYRU").

During the relevant period, the Rugby Club was a dues-paying member of the MNYRU. The MNYRU is apparently a private league, unaffiliated with any university, that organizes rugby play for collegiate and non-collegiate teams. The MNYRU prohibits member teams from playing, scrimmaging, or practicing against non-member teams.

*Gilbert's Participation in the Rugby Club.* Gilbert, who is domiciled in Connecticut, enrolled in Seton Hall as a full time student in the fall of 1990 after completing one year of study at Long Island University. He lived in New Jersey on or near the Seton Hall campus during the academic years 1990–91 and 1991–92.

Gilbert's first experience with rugby occurred in the spring of 1991, during his second semester at Seton Hall, when he joined the Rugby Club. That semester, he attended the club's bi-weekly practice regularly and played in most of the club's regularly scheduled games. Also during that semester, he filled out a waiver of liability for the academic year 1990–91.

When Gilbert returned to Seton Hall for his second year in the fall of 1991, he continued participating in the Rugby Club, but did not sign a waiver of liability for the new academic year. During the fall semester, he attended almost all the practices and played in all of the matches. In the spring and fall of 1991 combined, Gilbert participated in approximately ten rugby matches.

In the spring semester of 1992, Gilbert continued regularly attending practice. He played the first two matches that semester. On both occasions he played wing forward, the same position he had regularly played the previous semester.

*St. John's Match.* On April 4, 1992, Gilbert and the Rugby Club traveled to Cunningham Park in Queens, New York, to play the third game of the spring season. The opposing team was nominally affiliated with St. John's University. Unknown to Gilbert or his fellow club members, the St. John's team had been banned by authorities of St. John's University in 1986, and the team playing against the Rugby Club on April 4, 1992, was a pickup team composed in part of St. John's students. The St. John's team had been suspended from the MNYRU.

Gilbert stated in his deposition that the field was not properly lined and lacked goalposts. A keg of beer was available, and some members of the opposing team drank from it. Gilbert did not drink alcohol during the game and saw none of his teammates drinking. No coach or faculty advisor accompanied the Rugby Club for the match. No "certified referee" was present, although there was apparently an individual performing the function of a referee.

Early in the game, on an inbounding play known as a "line out," Gilbert took possession of the ball. As he was trying to pitch the ball to a teammate, he was hit from behind. Several players then fell on top of him. As a result, Gilbert sustained serious injuries that rendered him a quadriplegic. There is no evidence that any unsportsmanlike conduct occurred on the play during which Gilbert was injured.

## II. Procedural History

In April 1994, the Plaintiff filed in the District Court a diversity complaint alleging violations of New York law against Seton Hall and St. John's University. He later filed an amended complaint, joining three individual defendants.

The amended complaint alleges, among other things, that Seton Hall was negligent in supervising the team by failing to ensure the active participation of a faculty advisor and/or coach, and that, if Seton Hall had provided adequate supervision, the match would not have taken place because the field was not a properly sanctioned rugby field, there was no certified referee present, members of the opposing team were drinking beer, members of the Rugby Club had drank beer the night before, and the opposing team was not sanctioned by St. John's University and was suspended from the MNYRU.

In November 2000, Magistrate Judge Go, to whom the case had been assigned for all purposes, granted Seton Hall's motion for summary judgment. The other defendants were dismissed either previously or subsequently. With respect to Seton Hall, the Court concluded that New Jersey's law of charitable immunity was applicable and provided Seton Hall with a complete defense.[1] Judgment was entered December 8, 2000.

## Discussion

New Jersey law recognizes the doctrine of "charitable immunity," whereby nonprofit corporations and associations organized exclusively for religious, charitable, or educational purposes are immune from negligence liability for injuries caused to a beneficiary of the charitable institution.

---

1. With respect to other grounds urged in support of summary judgment, the Court ruled that factual issues remained.

N.J. Stat. Ann. § 2A:53A–7 (West 2000). Although New York and Connecticut once recognized charitable immunity, both abolished the doctrine long before the events giving rise to this suit. *See Bing v. Thunig,* 2 N.Y.2d 656, 666–67, 163 N.Y.S.2d 3, 8–9, 143 N.E.2d 3 (1957); Conn. Gen.Stat. § 52–557d (2003) (enacted 1967).

The parties agree that, if New Jersey law applies, summary judgment was properly granted. Gilbert argues that New York conflicts law requires the law of New York to be applied, defeating Seton Hall's charitable immunity defense.

■ In diversity cases, federal courts apply the choice of law rules of the forum state, in this case, New York. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, "[o]ur task is to determine what law New York courts would apply in this situation." *O'Rourke v. Eastern Air Lines, Inc.,* 730 F.2d 842, 847 (2d Cir.1984), *abrogated on other grounds, Salve Regina College v. Russell,* 499 U.S. 225, 230, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

■ Where the conflict of law concerns a loss-allocating rule, a rule that "prohibit[s], assign[s], or limit[s] liability after the tort occurs," *Padula v. Lilarn Properties Corp.,* 84 N.Y.2d 519, 522, 620 N.Y.S.2d 310, 312, 644 N.E.2d 1001 (1994), New York courts resolve the conflict by employing the methodology set forth in *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972). *See Cooney v. Osgood Machinery, Inc.,* 81 N.Y.2d 66, 71–75, 595 N.Y.S.2d 919, 922–24, 612 N.E.2d 277 (1993) (applying *Neumeier* to resolve a conflict of laws); *see also Caruolo v. John Crane, Inc.,* 226 F.3d 46, 57 (2d Cir.2000) (same). Charitable immunity is a loss-allocating rule, and therefore we look to *Neumeier. See Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 198–202, 491 N.Y.S.2d 90, 96–98, 480 N.E.2d 679 (1985) (applying *Neumeier* to conflict of laws issue regarding charitable immunity law).

■ In *Neumeier,* the Court of Appeals adopted a framework of three rules for determining the applicable law. The third rule, applicable where the parties reside in different jurisdictions and the allegedly tortious conduct occurs in a third jurisdiction, *see Neumeier,* 31 N.Y.2d at 128, 335 N.Y.S.2d at 70, 286 N.E.2d 454, governs this case because Gilbert is a domiciliary of Connecticut, *see Seitelman v. Lavine,* 36 N.Y.2d 165, 171, 366 N.Y.S.2d 101, 105, 325 N.E.2d 523 (1975) ("students do not gain or lose a residence simply because they are away from home"), Seton Hall is domiciled in New Jersey, and the injury took place in New York. The third *Neumeier* rule directs a court to apply the law of the jurisdiction where the injury occurred unless it can "be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or producing great uncertainty for litigants." *Neumeier,* 31 N.Y.2d at 128, 335 N.Y.S.2d at 70, 286 N.E.2d 454 (*quoting Tooker v. Lopez,* 24 N.Y.2d 569, 585, 301 N.Y.S.2d 519, 533, 249 N.E.2d 394 (1969) (Fuld, C.J., concurring)); *see also Padula,* 84 N.Y.2d at 521, 620 N.Y.S.2d at 311, 644 N.E.2d 1001 ("In the context of tort law, New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation.").

The substantive law of three states has potential relevance in this case—New York where the injury occurred, New Jersey where the defendant is domiciled, and Connecticut where the plaintiff is domiciled. As to New York's interest, the New York Court of Appeals has made it reasonably clear that the state in which the inju-

ry occurs has little interest in seeing its own loss allocation rules applied. In a case resembling ours in that New York's only connection to the litigation was that the tort occurred there, the Court of Appeals declined to apply New York law, stating "New York has no significant interest in applying its own law to this dispute." *Schultz*, 65 N.Y.2d at 201, 491 N.Y.S.2d at 98, 480 N.E.2d 679. The Court observed that because charitable immunity is a rule that "allocat[es] losses that result from admittedly tortious conduct," *id.* at 198, 491 N.Y.S.2d at 96, 480 N.E.2d 679, as opposed to a rule that establishes standards of conduct, the jurisdiction in which the injury occurs "has at best a minimal interest in determining the right of recovery or the extent of the remedy." *Id.*

■ As to New Jersey's interest, the Court of Appeals decision in *Schultz* identified three factors that supported New Jersey's interest in that case and similarly support its interest in the pending case. One factor was that the plaintiffs had benefitted from New Jersey's law of charitable immunity and the State therefore had a rightful interest in holding them to its burdens as well. *See id.* at 201–02, 491 N.Y.S.2d at 97–98, 480 N.E.2d 679. Although Gilbert is not a domiciliary of New Jersey, he, like the plaintiffs in *Schultz*, has benefitted from the charitable immunity law of New Jersey by virtue of his voluntary decision to attend a university in that state.

Charitable immunity reduces the cost at which an institution can provide its services, and, because the institution has no profit motive, these savings are presumably passed on to some extent to the institution's beneficiaries; in return, individuals who choose to take advantage of the institution's services bear the risk that any injury they suffer due to the negligence of the charitable institution will not be com-

pensated by the institution. By electing to attend an institution that is protected by and benefits from New Jersey charitable immunity laws, Gilbert has presumably obtained a better value for his (or his parents') money than he would have obtained if Seton Hall did not enjoy charitable immunity. Because Gilbert has indirectly availed himself of the charitable law of New Jersey and benefitted from it, New Jersey has a strong interest in having him bear a related burden. That the dollar value of the burden in this case exceeds the benefit does not alter the relevance of this first *Schultz* factor.

■ A second factor identified in *Schultz* to favor application of New Jersey's charitable immunity law was that the state had an interest in encouraging the work of charities located within its borders. *See id.* at 201, 491 N.Y.S.2d at 97, 480 N.E.2d 679. Similarly here, New Jersey has an important interest in having its law applied so that its universities can continue to provide services to all students at lower costs. It is very common today for universities to enroll a significant number of out-of-state students. Indeed, many universities consider that maintaining a geographically diverse student body is desirable and take this into account during their admissions process. New Jersey has an interest in ensuring that its universities can continue to attract out-of-state students and provide them a low cost educational service without being exposed to unpredictable liability *vis à vis* those students.

■ A third factor identified in *Schultz* was that while the injury had taken place in New York, most of the relevant contact between the parties in that case had occurred in New Jersey. *See id.* at 201–02, 491 N.Y.S.2d at 98, 480 N.E.2d 679. As the Court of Appeals explained in *Cooney v. Osgood Machinery, Inc.*, 81 N.Y.2d 66,

595 N.Y.S.2d 919, 612 N.E.2d 277 (1993), "A primary reason that locus [of the tort] tips the balance, of course, is that ordinarily it is the place with which both parties have voluntarily associated themselves." *Id.* at 77, 595 N.Y.S.2d at 925, 612 N.E.2d 277. In *Schultz,* however, the Court did not apply the law of the locus state in part because the parties, although domiciled in different states, had most of their relevant contacts in New Jersey, the plaintiffs' domicile, and not in New York, the locus state.

■ As in *Schultz,* it is undisputed that most of the "voluntary association" between Gilbert and Seton Hall occurred not in New York but in New Jersey, and that whatever failures in the supervision of the Rugby Club might be attributed to Seton Hall (such as not to send a coach) originated in New Jersey before the team left to play its match in New York. Because most of Gilbert's rugby-related activity and Seton Hall's alleged rugby-related negligence occurred in New Jersey, it would be consistent with both parties' expectations that the law of New Jersey would govern questions of loss allocation that might arise between them. *See Schultz,* 65 N.Y.2d at 201–02, 491 N.Y.S.2d at 98, 480 N.E.2d 679 (observing that application of New Jersey law would "provide certainty for the litigants whose only reasonable expectation" would be that the law of New Jersey, where the parties had shared most of their contacts, would apply).

A common theme reflected in all these factors is that Gilbert's decision to attend a university in New Jersey greatly increased the appropriateness of applying that state's law regarding charitable immunity with respect to any claim he might bring against Seton Hall. *See id.* at 196, 491 N.Y.S.2d at 94, 480 N.E.2d 679 (" '[C]ontrolling effect' must be given 'to the law of the jurisdiction which, because of its rela-

tionship or contact with the occurrence *or the parties,* has the greatest concern with the specific issue raised in the litigation.' ") (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 749, 191 N.E.2d 279 (1963)) (emphasis added).

■ As to Connecticut's interest, that state is Gilbert's domicile, and, at least as to accidents where the place of the tort is fortuitous, New York has preferred the law of a plaintiff's domicile to the law of the jurisdiction where the tort occurred. *See Babcock,* 12 N.Y.2d at 482, 240 N.Y.S.2d at 750, 191 N.E.2d 279 (applying New York law where plaintiff and defendant resided in New York, but accident fortuitously occurred in Ontario); *see also Pescatore v. Pan American World Airways,* 97 F.3d 1, 12–14 (2d Cir.1996) (applying New York's choice-of-law principles to decide that law of Ohio, which was domicile of plaintiff and decedent, should apply where locus of tort was fortuitous). However, the locus here was not fortuitous, and we see no indication that New York law generally surrounds a plaintiff with his home state's repeal of charitable immunity in the face of the plaintiff's voluntary relationship to a defendant·domiciled in a state that maintains such immunity. Moreover, Connecticut's interest in according Gilbert the benefits of its charitable immunity policy is reduced because, at least with respect to his university education, he has avoided the policy's concomitant burden of paying the increased fees that a Connecticut institution, subject to negligence liability, must charge.

■ Taking our guidance from the factors identified as relevant by the New York Court of Appeals, we conclude that New York would consider the interests of New Jersey to be paramount in this case,

and would apply that state's law of charitable immunity.[2]

We disagree with Gilbert's contention that a court may decline to apply the law of the locus state only if the alternative would advance the relevant substantive law purposes of *all* of the states involved. Although one district court has interpreted *Schultz* in this way, *see Cook v. Goodhue*, 842 F.Supp. 1509, 1511 (N.D.N.Y.1994), there appears to be no support for this interpretation in the decisions of the New York Court of Appeals or the Appellate Division. More importantly, this interpretation is incompatible with the reasoning and result of *Schultz*, where the New York Court of Appeals applied New Jersey's law of charitable immunity despite the fact that under the law of Ohio, where one of the charitable defendants was domiciled, and New York, where the injury occurred, charitable immunity would not have been a defense to the form of negligence alleged. Also unavailing is Gilbert's alternate theory that we should decide the question by majority rule and reject the defense of charitable immunity because the defense is unavailable in two of the three jurisdictions with any relevance to this case. Nothing in *Schultz* evidences so numerical an approach; indeed, *Schultz* applied New Jersey's law of charitable immunity rather than the conflicting law of both New York and Ohio.

### Conclusion

The judgment of the District Court is affirmed.[3]

---

**2.** We have determined not to certify the choice of law issue to the New York Court of Appeals because, although no prior New York decision involves our precise facts, the guidance of the State's case law is adequate for decision, and certification is normally appropriate for "unsettled questions of state law,

SOTOMAYOR, Circuit Judge, dissenting.

I agree that the majority's outcome is a reasonable application of New York choice of law principles. My concern is that the majority's conclusion is not the *only* reasonable application of New York law. Because I think the courts of New York have not clearly stated whether the *Neumeier* rules override, in the loss-allocation context, the interest-balancing approach that is generally conducted in tort conflicts, or whether the *Neumeier* rules instead incorporate this general interest-balancing approach, I would certify the choice of law question to the New York Court of Appeals. I thus respectfully dissent from the majority's opinion.

*Neumeier* Rule Three states that in a case in which the parties are domiciled in different states and the alleged tort occurred in a third state, the applicable law "is that of the jurisdiction where the accident happened *unless* it appears that 'displacing [the] normally applicable rule will advance the relevant substantive law purposes' of the jurisdictions involved." *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454, 458 (1972) (emphasis added) (alteration in original) (quoting *Tooker v. Lopez*, 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394, 404 (1969) (Fuld, C.J., concurring)). As New York is the situs of the alleged tort, I start with the presumption that New York charitable immunity law applies, and then consider whether displacing the normally applicable rule will advance the substantive law purposes of the jurisdictions involved.

especially those that seem likely to recur." *Kidney v. Kolmar Laboratories, Inc.*, 808 F.2d 955, 957 (2d Cir.1987).

**3.** In view of our conclusion, we need not consider the Appellee's alternative grounds for affirmance.

As the majority notes, the leading case applying *Neumeier* Rule Three is *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985). *Schultz* involved tort claims against two defendants, the Boy Scouts of America and Franciscan Brothers. The plaintiffs and the Boy Scouts were domiciled in New Jersey, Franciscan Brothers was domiciled in Ohio, and the tort occurred primarily in New York. In evaluating the plaintiffs' claim against Franciscan Brothers, the court decided that Franciscan Brothers had "met its burden of demonstrating that the law of New Jersey, rather than the law of New York, should govern plaintiffs' action against it." *Id.* at 687. The court noted that application of New Jersey charitable immunity law would further New Jersey's interests in "enforcing the decision of its domiciliaries to accept the burdens as well as the benefits of that State's loss-distribution tort rules," and in "promoting the continuation and expansion of [Franciscan Brothers'] charitable activities in that State." *Id.* As for New York's interests, the court held that while applying New Jersey law "may not affirmatively advance the substantive law purposes of New York, it [would] not frustrate those interests because New York has no significant interest in applying its own law to this dispute." *Id.*

Applying the analysis of *Schultz* to the instant case, I agree with the majority that because the locus jurisdiction in loss-allocation cases has only a minimal interest in determining the right of recovery, *id.* at 685, 687, New York's substantive law purposes would at the least not be undermined by the application of New Jersey law. It is also obvious that displacing New York law in favor of New Jersey law would advance New Jersey's substantive law purposes. However, it is unclear from *Neumeier* and *Schultz* whether, before we displace New York law, we must *also* find that Connecticut's interests would be advanced by the application of New Jersey law.

The lack of clarity regarding the role of Connecticut's interests stems from the *Schultz* court's silence concerning the interests of the third state involved in that case—*Schultz* simply considers the interests of New York and New Jersey. *Id.* at 687. The third state, Ohio (the domicile of Franciscan Brothers), had a limited charitable immunity statute that denied immunity in actions, such as the one at issue in that case, based on negligent hiring and supervision. *Id.* at 682. But it is far from clear whether *Schultz* declined to discuss Ohio's interests because the court found those interests to be advanced (or at least not hindered) by the application of New Jersey law, or because it found them to be hindered but of insufficient weight to overcome New Jersey's greater interest. The outcome in *Schultz* could be the result of either a direct, literal application of *Neumeier* Rule Three, or of an indirect application of the rule through the incorporation of a more flexible interest-balancing approach. That is, the *Schultz* opinion could be read as concluding that Ohio's substantive law purposes would be advanced (or at least not hindered) by the application of New Jersey charitable immunity law; or it could be read as concluding that on balance, New Jersey had the greater interest in seeing its law applied. I am not alone in finding New York law unclear on this point: "There is confusion in New York state and federal courts about the proper construction of ... *Schultz* and the ... *Neumeier* rules. Some courts have applied the *Neumeier* rules rigidly. Others have ignored them in favor of a pure governmental interest analysis." Lee S. Kreindler et al., 16 N.Y. Practice Series, N.Y. Law of Torts § 18:36 (2002) (footnotes omitted) (citing cases).

By its terms, *Neumeier* Rule Three seems to require something other than (and different from) general interest balancing; I read *Neumeier* to require that the substantive law purposes of all relevant states must be advanced before we can displace the *lex loci delicti*. *See Cook v. Goodhue*, 842 F.Supp. 1509, 1511 (N.D.N.Y.1994) ("The exception to [*Neumeier*] Rule Three simply states that applying the law of a state other than that of the place of the injury will advance the relevant substantive law purposes. This means the purposes of *all* of the substantive laws relevant to the conflict, not just the laws of the state whose laws are [sought] to be applied. There is no 'either' in the rule. Otherwise, it would be very easy for a party to demonstrate that the application of a particular state's law will advance the purposes of that law."). The test under *Neumeier* is thus not which state among the three has the *greatest* interest in applying its law; rather, the test is whether each state's interest would be advanced (or not hindered) by application of a law other than the *lex loci delicti*.[1] So long as Connecticut's interests would be hindered by the application of New Jersey law, I read *Neumeier* to require that we not displace the *lex loci delicti*.

The majority's analysis, with its overriding emphasis on the strength of New Jersey's interests and the extent of the parties' contacts in that state, comes much closer to a general interest balancing than to literal application of *Neumeier* Rule Three. The majority could be right in its interpretation of New York choice of law principles; the New York Court of Appeals might incorporate an interest-balanc-

ing approach into *Neumeier* Rule Three and decide that New Jersey has the greater interest in seeing its law applied. *Cf. Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 620 N.Y.S.2d 310, 644 N.E.2d 1001, 1002 (1994) ("In the context of tort law, New York utilizes interest analysis to determine which of two competing jurisdictions has the greater interest in having its law applied in the litigation."). As I have explained, however, the majority's application of *Neumeier* Rule Three is not the only possible interpretation of New York law (nor, as I note below, is it even the most reasonable), and in these circumstances I think that federal-state comity and the exercise of good judgment call for certification of this question to the New York Court of Appeals.

Certification of a determinative question of state law is appropriate where, as here, existing state precedents do not enable us to predict how that state's highest court would decide the question. *See McCarthy v. Olin Corp.*, 119 F.3d 148, 154 (2d Cir. 1997) ("Because it is our job to predict how the forum state's highest court would decide the issues before us, we will not certify questions of law where sufficient precedents exist for us to make [that] determination."). For example, in *Liriano v. Hobart Corp.*, 132 F.3d 124 (2d Cir.1998), we certified a question of state law to the New York Court of Appeals where our review of the applicable precedents concluded that "at least four possible views of New York law present themselves." *Id.* at 131. Here, certification is warranted because there are at least two possible and conflicting views of New York law that we can ascertain from the relevant precedents—*Neumeier* Rule Three is either to

---

1. The magistrate judge considered *Cook* and declined to follow it because she found it to be "contrary to New York interest analysis." This aptly illustrates both the tension between

*Neumeier* Rule Three and a general interest analysis, as well as the confusion among courts as to which approach must be applied.

be directly and literally applied according to its language, or is to be indirectly applied by combining it with a general interest-balancing approach.

*Liriano* is admittedly distinguishable from the instant case because *Liriano* involved a question of law that the New York Court of Appeals had never addressed and on which there existed divergent views in the intermediate New York appellate courts, *see id.* at 132, while the instant case instead involves two decisions of the New York Court of Appeals that have left unclear which of two possible analytical approaches should be applied. The same rationale, however—that certification is warranted where existing state-court precedents do not enable us to predict with confidence the outcome that the state's highest court would reach—applies equally to the state-law question at issue in *Liriano* and the state-law question we confront here.

Certification is especially warranted in the instant case because the majority's reading of New York law represents a step away from the formulaic approach that the *Neumeier* rules embody, and a return to the kind of general interest balancing that the *Neumeier* rules were intended, in my view, to replace. If the Court of Appeals intended to move away from *Neumeier* with *Schultz*, we ought to give that court the opportunity to state this intent directly.

Even if I were to agree with the majority that New York law is sufficiently clear to enable us to predict how the Court of Appeals would decide this case, I would disagree with the majority's conclusion as to what the Court of Appeals' resolution would be. I am reluctant to read the Court of Appeals' decision in *Schultz* as a departure from *Neumeier*, as I believe the majority does, because of the strong arguments in favor of applying *Neumeier* Rule Three literally rather than engaging in a more subjective interest-balancing approach. In fact, the majority's analysis in the instant case seems to me to provide a perfect example of the difficulties inherent in attempting to identify and balance states' interests in seeing their laws applied. One such difficulty is that courts may not always accurately identify or properly weigh the interests of each state in the conflict. Here, for example, the majority takes a limited view of Connecticut's interest in having its own charitable immunity law applied, failing to note that Connecticut has an important and compelling interest in protecting its state healthcare and insurance systems from bearing the uncompensated cost of Gilbert's lifetime disability. This Court has consistently held that the state of a plaintiff's domicile "has an important and obvious interest in ensuring that its residents are fully and adequately compensated for tortious harm." *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 14 (2d Cir.1996); *see also Sheldon v. PHH Corp.,* 135 F.3d 848, 853 (2d Cir.1998) ("When the extent of victim compensation is at issue, the plaintiff's domicile has an interest in applying its law because that forum is where the loss is felt and where the burden of the victim's uncompensated needs may fall." (emphasis omitted)).

A second difficulty is that the interests of the relevant states may not always be of a type that can easily be quantified and compared side by side. In the instant case, for example, the majority's analysis fails to acknowledge that the economic trade-off between a state system of charitable immunity and one of non-immunity becomes difficult to calculate and balance where the parties to a dispute are domiciled in states with different rules. That is, New Jersey's decision to provide charitable immunity to institutions within its

state involves a trade-off that the state has decided to make—it reduces the cost to charitable institutions of providing services, thus encouraging and facilitating their operation; and it concomitantly increases the risk that the state will have to internalize (through its health-care, insurance, and other state service systems) the costs that state residents, injured as a result of a charitable institution's negligence, are unable to bear individually. Connecticut has made the converse trade-off in its decision *not* to provide charitable immunity. In a case like Gilbert's, however, New Jersey only benefits (because its charitable institutions are immune from suit) and Connecticut only loses (because its state services must bear the uncompensated burden of Gilbert's permanent disability).

Taking both of these additional considerations into account, it is far from clear to me that the majority has accurately or comprehensively weighed the relevant "substantive law purposes" at issue. The difficulty of accounting for all of the interests relevant to a state's system of loss-allocation, and of balancing when the interests of several states are involved, provides a strong argument for applying the *Neumeier* rules literally. Direct application of *Neumeier* Rule Three in this case would lead to a straightforward result: the exception to *Neumeier* Rule Three has not been met, and New York's law—as the *lex loci delicti*—must be applied, because displacing New York's law with New Jersey's would not advance the substantive law purposes of all the relevant jurisdictions.

However, because (as I have noted) New York law is not entirely clear regarding whether the *Neumeier* rules are to be literally applied, or whether courts are to conduct a more general interest balancing,

I would certify the choice of law issue to the New York Court of Appeals.